1   GREGORY G. KATSAS
    Assistant Attorney General
2
    JOHN R. TYLER
3   Assistant Director, Federal Programs Branch

4   MARCIA BERMAN (PA Bar No. 66168)
    Trial Attorney, U.S. Department of Justice
5   Civil Division, Federal Programs Branch
    20 Massachusetts Ave., N.W., Room 7132
6   Washington, D.C. 20530
    Telephone: (202) 514-2205
7   Facsimile: (202) 616-8470
    Email: marcia.berman@usdoj.gov
8   *Attorneys for Defendants*

9
                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11
                         SAN FRANCISCO
12

13

14  _____  ) No. 08-2997 JSW
                                          )
15  ELECTRONIC FRONTIER FOUNDATION,       )
                                          ) **NOTICE OF CONSOLIDATED**
16  Plaintiff,                            ) **MOTION FOR SUMMARY**
                                          ) **JUDGMENT AND MEMORANDUM**
17       v.                               ) **OF POINTS AND AUTHORITIES**
                                          ) **IN SUPPORT OF MOTION**
18  OFFICE OF THE DIRECTOR OF NATIONAL    )
    INTELLIGENCE and UNITED STATES        )
19  DEPARTMENT OF JUSTICE                 ) DATE:      March 13, 2009
                                          ) TIME:      9:00 a.m.
20  Defendants,                           )
    _____  )
21

22

23

24

25

26

27

28

Defs' Notice of Consol. Mtn for Summary Judgment; Mem. in support thereof - C 08-2997 (JSW)

1

<u>TABLE OF CONTENTS</u>

2

PAGE(S)

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    The FISA Reform Legislation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Plaintiff's FOIA Requests, Defendants' Responses,
    and the Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
    ON PLAINTIFF'S FOIA CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        I.      DEFENDANTS PROPERLY WITHHELD
               PURSUANT TO EXEMPTION 5
               RECORDS REFLECTING COMMUNICATIONS
               BETWEEN ODNI OR DOJ OFFICIALS AND
               MEMBERS OF CONGRESS OR THEIR
               STAFFS CONCERNING AMENDMENTS TO FISA . . . . . . . . . . . . . . . . 6

               A.      The Withheld Communications Satisfy
                       Exemption Five's Inter-agency or Intra-
                       agency Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

               B.      The Withheld Communications Are
                       Protected From Disclosure by the
                       Deliberative Process Privilege. . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

               C.      The Withheld Communications Are
                       Protected From Disclosure by the
                       Presidential Communications
                       Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        II.     RECORDS CONCERNING COMMUNICATIONS
               BETWEEN ODNI AND DOJ OFFICIALS AND
               REPRESENTATIVES OF
               TELECOMMUNICATIONS COMPANIES,
               REGARDING AMENDMENTS TO FISA, ARE
               ALSO PROTECTED FROM DISCLOSURE
               PURSUANT TO EXEMPTION 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

               A.      These Communications Meet the
                       Inter-agency or Intra-agency
                       Requirement of Exemption 5 and are
                       Protected from Disclosure by the
                       Common Interest Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

               B.      The Withheld Communications Are
                       Protected From Disclosure by the
                       Attorney Work Product Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . 26

C.   The Withheld Communications Are
Protected from Disclosure by the
Deliberative Process Privilege and the
Presidential Communications
Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

III.   DEFENDANTS PROPERLY WITHHELD
PURSUANT TO  EXEMPTION 3 INFORMATION
THAT IS EXEMPT FROM DISCLOSURE BY
STATUTE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

IV.   DEFENDANTS PROPERLY WITHHELD
CLASSIFIED MATERIALS UNDER EXEMPTION 1 . . . . . . . . . . . . 31

V.   THE FBI PROPERLY WITHHELD INFORMATION
PURSUANT TO EXEMPTIONS 2 AND 7(E) . . . . . . . . . . . . . . . . . . 33

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

1

## TABLE OF AUTHORITIES

2

### CASES                                                                PAGE(S)

3    Ass'n of Am. Physicians and Surgeons, Inc. v. Clinton,
          997 F.2d 898 (D.C. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
4
     Berger v. Seyfarth Shaw LLP,
5         2008 WL 4681834 (N.D. Cal. Oct. 22, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

6    Berman v. CIA,
          501 F.3d 1136 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 29, 30
7
     Berman v. CIA,
8         378 F. Supp. 2d 1209 (E.D. Cal. 2005) , aff'd on other grounds,
          501 F.3d 1136 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 17, 18, 19
9
     Binion v. DOJ,
10        695 F.2d 1189 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

11   CIA v. Sims,
          471 U.S. 159 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 29
12
     Carter v. Dep't of Commerce,
13        307 F.3d 1084 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

14   In re Cheney,
          406 F.3d 723 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
15
     Citizens Comm'n on Human Rights v. FDA,
16        45 F.3d 1325 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

17   DOJ v. Julian,
          486 U.S. 1 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
18
     Dep't of Air Force v. Rose,
19        425 U.S. 352 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

20   Dep't of Interior v. Klamath Water Users Protective Ass'n,
          532 U.S. 1 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11
21
     Dirksen v. U.S. Dep't of Health and Human Services,
22        803 F.2d 1456 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

23   Dow Jones & Co. v. DOJ,
          917 F.2d 571 (D.C. Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
24
     EPA v. Mink,
25        410 U.S. 73 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13

26   Feshbach v. SEC,
          5 F. Supp. 2d 774 (N.D. Cal. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     Frugone v. CIA,
          169 F.3d 772 (D.C. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Goland v. CIA,
    607 F.2d 339 (D.C. Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

In re Grand Jury Subpoena (Mark Torf/Torf Environmental Management),
    357 F.3d 900 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

In re Grand Jury Subpoenas: Under Seal,
    415 F.3d 333 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Halperin v. CIA,
    629 F.2d 144 (D.C. Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Hardy v. ATF,
    631 F.2d 653 (9th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Hepting v. AT&T Corp.,
    No. 06-0672 (N.D. Cal.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Hickman v. Taylor,
    329 U.S. 495 (1947). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Hiken v. DoD,
    521 F. Supp. 2d 1047 (N.D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Hunt v. CIA,
    981 F.2d 1116 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 29

Hunton & Williams, LLP v. DOJ,
    2008 WL 906783 (E.D. Va. Mar. 31, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 26

John Doe Agency v. John Doe  Corp.,
    493 U.S. 146 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

Judicial Watch v. Dep't of Energy,
    412 F.3d 125 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

Judicial Watch v. DOJ,
    365 F.3d 1108 (D.C. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21, 22

Kissinger v. Reporters Comm. for Freedom of the Press,
    445 U.S. 136 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Lardner v. DOJ,
    2005 WL 758267 (D.D.C. Mar. 31, 2005. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 19

Linder v. NSA,
    94 F.3d 693 (D.C. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Lion Raisins v. USDA,
    354 F.3d 1072 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Loving v. DoD,
    496 F. Supp. 2d 101 (D.D.C. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Maricopa Audubon Soc'y v. U.S. Forest Serv.,
    108 F.3d 1089 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 34

Minier v. CIA,
    88 F.3d 796 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 32, 33

Murphy v. Dep't of Army,
    613 F.2d 1151 (D.C. Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Nat'l Institute of Military Justice v. DoD,
    512 F.3d 677 (D.C. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11

Nat'l Labor Relations Bd. v. Sears, Robuck & Co.,
    421 U.S. 132 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 16

Nidec Corp. v. Victor Co. of Japan,
    249 F.R.D. 575 (N.D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

Nixon v. Administrator of General Services ("Nixon II"),
    433 U.S. 425 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22

Public Citizen, Inc. v. DOJ,
    111 F.3d 168 (D.C. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Public Citizen v. DOJ,
    491 U.S. 440 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Rockwell Int'l Corp. v. DOJ,
    235 F.3d 598 (D.C. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Ryan v. DOJ,
    617 F.2d 781 (D.C. Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 11, 13

Sakamoto v. EPA,
    443 F. Supp. 2d 1182 (N.D. Cal. 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Salisbury v. United States,
    690 F.2d 966 (D.C. Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

In re Sealed Case,
    121 F.3d 729 (D.C. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20, 21, 22, 23

Tigue v. DOJ,
    312 F.3d 70 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Bergonzi,
    216 F.R.D. 487 (N.D. Cal. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

United States v. Nixon,
    418 U.S. 683 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

Waller v. Financial Corp. of America,
    828 F.2d 579 (9th Cir.1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Warth v. DOJ,
    595 F.2d 521 (9th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Weinberger v. Catholic Action of Hawaii,

454 U.S. 139 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

**STATUTES AND OTHER AUTHORITIES**

5 U.S.C. § 551(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

5 U.S.C. § 552, <u>et seq</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

18 U.S.C. 798 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29, 31

50 U.S.C. § 402 note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31

50 U.S.C. § 403, <u>et seq</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

50 U.S.C. §§ 1801-1811. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Executive Order 12,958. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Protect America Act of 2007, Pub. L. No. 110-55, 121 Stat. 552 . . . . . . . . . . . . . . . . . . . . . . . 3

Foreign Intelligence Surveillance Act of 1978 Amendments Act of 2008,
      Pub. L. 110-261, 122 Stat, 2467, Title II, § 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

S. Rep. No. 95-604, 95th Cong. 2d 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

Please take notice that on March 13, 2009, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 2 of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, Seventeenth Floor, San Francisco, California, defendants Office of the Director of National Intelligence and United States Department of Justice will move for summary judgment, pursuant to Federal Rule of Civil Procedure 56, on the ground that defendants properly withheld information from disclosure pursuant to well-recognized exemptions to the Freedom of Information Act, 5 U.S.C. § 552.

This motion will be a consolidated motion for summary judgment for C 08-1023 (JSW) and C 08-2997 (JSW).  (See Civil Action No. 08-1023, dkt. # 59).  The motion will be based on this Notice of Motion for Summary Judgment, the Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment, any brief in opposition to any cross-motion for summary judgment and reply in support of Defendants' Motion for Summary Judgment, the declarations and attachments thereto submitted in support of Defendants' Motion for Summary Judgment, and any other papers and records appropriately filed with the Clerk.

Dated: December 10, 2008                    Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JOHN R. TYLER
Assistant Director, Federal Programs Branch

*/s/ Marcia Berman*
MARCIA BERMAN (PA Bar No. 66168)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 7132
Washington, D.C. 20530
Telephone: (202) 514-2205
Facsimile: (202) 616-8470
E-mail: marcia.berman@usdoj.gov

*Attorneys for Defendants*

INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff in this case, the Electronic Frontier Foundation ("EFF"), challenges the decision of the Office of the Director of National Intelligence ("ODNI") and the Department of Justice ("DOJ") to withhold records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Plaintiff's requests seek records regarding ODNI and DOJ's communications with Members of Congress and congressional staffs and with telecommunications companies about proposed amendments to the Foreign Intelligence Surveillance Act ("FISA"). The documents requested by plaintiff include reams of electronic mail ("email") correspondence between Executive and Legislative Branch officials as they sought to craft consensus legislation on a controversial, complex subject of national importance. Unsurprisingly, many of the responsive documents reveal the deliberations of Executive and Legislative Branch officials as they discussed, analyzed, and negotiated possible amendments to FISA. Plaintiff sought this correspondence while the FISA amendment debate was on-going.

Much of the formal legislative process takes place in public view. However, there is a substantial public interest in the political Branches also having the freedom to engage in an informal and robust confidential discourse as they negotiate the details of legislation. There can be no doubt that compelled public disclosure of the inter-Branch communications at issue in this case would chill the willingness of Executive and Legislative Branch officials to deliberate over complex legislation by email and thus impair the functioning of both Branches as they exercise their constitutional authorities with respect to the legislative process.

FOIA mandates disclosure of government records unless the requested information falls within an enumerated exception. As we demonstrate below, most of the documents at issue in this case consist of quintessential deliberative process communications, properly exempt from disclosure under FOIA's Exemption 5. Because the Executive Branch officials involved in these communications were acting as the President's advisers and agents in forging agreement with Congress on FISA reform legislation, their communications are also protected from disclosure by the presidential communications privilege. In addition, many of the documents reflecting communications between ODNI or DOJ officials and representatives of telecommunications carriers

1  who had an interest in the inclusion of liability protection in the FISA amendments are also

2  protected by the attorney work product doctrine.  These communications contain attorneys' legal

3  analysis of FISA reform proposals and their impact on pending litigation in which the

4  telecommunications carriers and the United States share a common interest.  ODNI and DOJ also

5  properly withheld information, including the identities of telecommunications carriers that may have

6  assisted, or may in the future assist, the government with intelligence activities, protected by

7  recognized nondisclosure statutes, as well as a small amount of classified and law enforcement

8  materials.

9  **BACKGROUND**

10  The FISA Reform Legislation

11    Congress enacted FISA, 50 U.S.C. §§ 1801-1811, as amended, in 1978 to "provide a

12  procedure under which the Attorney General can obtain a judicial warrant authorizing the use of

13  electronic surveillance in the United States for foreign intelligence purposes."  S. Rep. No. 95-604,

14  95th Cong. 2d 5, reprinted at 1978 U.S.C.C.A.N. 3906.  Congress carefully crafted FISA to balance

15  the need to collect foreign intelligence information for national security purposes with the need to

16  protect individual civil liberties and privacy rights.  (Declaration of J. Michael McConnell, Director

17  of National Intelligence, at ¶ 12 ("McConnell decl.")).

18    The Intelligence Community faced challenges collecting foreign intelligence under FISA,

19  and the President and others in the Administration, including the Director of National Intelligence

20  ("DNI"), determined that FISA reform was necessary.[1]  The terrorist attacks of September 11, 2001

21  made the need for FISA reform even more apparent.  Two concerns motivated the Administration's

22  reform agenda:  that significant advances in communications technology since 1978 had rendered

23  certain elements of the FISA regime anachronistic, and that the increasing risk of legal liability

24  would deter the private sector from voluntarily cooperating with government surveillance activities.

25

26    [1]  The DNI serves as the head of the United States Intelligence Community and as the

27  principal adviser to the President, the National Security Council, and the Homeland Security Council
   for intelligence matters related to national security.  50 U.S.C. §§ 403(b)(1), (2).  (See also

28  McConnell decl. at ¶ 6).  The Office of the Director of National Intelligence ("ODNI") assists the
   DNI in carrying out his duties and responsibilities.  See 50 U.S.C. § 403-3.

1    (McConnell decl. at ¶ 13).   Numerous lawsuits had been filed against telecommunications

2    companies for their alleged participation in the government's intelligence gathering activities after

3    the attacks of September 11, 2001, see, e.g., In re NSA Telecommunications Records Litigation

4    (MDL Docket No. 06-1791 VRW) (N.D. Cal.), and the Administration was worried about the effect

5    of those lawsuits on the companies' willingness to cooperate with government requests in the

6    future.[2]  (McConnell decl. at ¶¶ 13-14; Declaration of Carl J. Nichols at ¶¶ 4, 21 ("Nichols decl.")).

7

8        Accordingly, in April 2007 the Administration, on behalf of the President, submitted draft

9    legislation to Congress addressing these concerns. (McConnell decl. at ¶¶ 14-15).   Although

10   Congress did not enact this legislation in its entirety, in August 2007 it enacted the Protect America

11   Act of 2007 ("PAA"), Pub. L. No. 110-55, 121 Stat. 552.  Set to expire in February 2008, the PAA

12   was a temporary measure that did not incorporate all of the Administration's proposals, but

13   nonetheless helped close critical intelligence gaps.   (See id.; McConnell decl. at ¶ 15).

14   Congressional debate and negotiations aimed at a long-term solution to FISA's infirmities continued

15   into 2008, with the House and Senate passing separate bills that differed in important respects.  The

16   authorities provided for in the PAA expired on February 16, 2008, without an agreement having

17   been reached.  As the House and Senate considered differing versions of alternative FISA reform

18   legislation, the Intelligence Community was able to continue with on-going surveillance activities

19   pursuant to the authorizations under the PAA, but the Intelligence Community was unable to initiate

20   any new measures under its authority.  (McConnell decl. at ¶ 16).

21       Finally, in June 2008 congressional leaders reached agreement on a compromise bill that

22   majorities in both the House and Senate were willing to accept and that the President was prepared

23   to sign, as he did on July 10.  (McConnell decl. at ¶ 16).  In July 2008 Congress passed, and the

24   President signed, the Foreign Intelligence Surveillance Act of 1978 Amendments Act of 2008, Pub.

25   L. 110-261, 122 Stat. 2467, Title II, § 201 ("FISA Amendments Act").  The FISA Amendments Act

26   was fundamentally the product of compromise.  Congress and the President reached agreement only

27

28       [2] Plaintiff is one of the lead counsel in this litigation.  See First Amended Complaint, Civil
     Action No. 08-2997, at ¶ 11 n.1.

after more than two years of intense, back-and-forth deliberation, with patient, focused, and sustained engagement over a number of iterations of legislative proposals and counter-proposals proving necessary to produce a compromise package of reforms.  (McConnell decl. at ¶¶ 16-17). Some of this deliberation took place in public view through, among other things, committee hearings and reports, formal statements of the Administration's views, and floor debate; but much of it necessarily occurred behind the scenes.  (Nov. 7, 2008 letter from Morgan J. Frankel, the Senate Legal Counsel, to the Assistant Attorney General for DOJ's Civil Division, Gregory G. Katsas at 1 ("Senate Legal Counsel ltr."), attached as Ex. A to Declaration of Daniel Meyer ("Meyer decl."); McConnell decl. at ¶¶ 18-22).

<u>Plaintiff's FOIA Requests, Defendants' Responses, and the Litigation</u>

By letters dated December 21, 2007, plaintiff submitted nearly identical FOIA requests to ODNI and five DOJ components:  Office of the Attorney General ("OAG"), Office of Legal Policy ("OLP"), Office of Legislative Affairs ("OLA"), Office of Legal Counsel ("OLC"), and National Security Division ("NSD").  (<u>See</u>, <u>e.g.</u>, Declaration of John F. Hackett at ¶ 9 ("Hackett decl.")). Plaintiff requested "all agency records from September 1, 2007 to the present concerning briefings, discussions, or other exchanges that [ODNI] Director McConnell or other ODNI officials [or in the case of the DOJ requests "Justice Department officials"] have had with 1) members of the Senate or House of Representatives and 2) representatives or agents of telecommunications companies concerning amendments to FISA, including any discussion of immunizing such companies or holding them otherwise unaccountable for their role in government surveillance activities."  <u>Id</u>.  On February 20, 2008, plaintiff filed a complaint, Civil Action No. 08-1023, seeking release of records responsive to the Dec. 21, 2007 request.  On April 4, 2008, the Court granted plaintiff a preliminary injunction, setting deadlines for the release of responsive records.

On April 24, 2008, plaintiff submitted another round of FOIA requests to the same agency components, seeking all records concerning briefings, discussions, or other exchanges between ODNI or DOJ officials and Members of Congress or their staffs, or representatives of telecommunications companies, regarding amendments to FISA.  Plaintiff also asked for all records reflecting any communications between ODNI or DOJ officials and certain named alleged

telecommunications representatives, regardless of the subject matter.  First Amended Complaint, Civil Action No. 08-2997, at ¶¶ 34-35.  Plaintiff further specified that it was not seeking communications from members of Congress to ODNI or DOJ officials.  Id. at ¶¶ 34 n. 3, 35 n. 5. On June 17, 2008, plaintiff filed an action, Civil Action No. 08-2997, seeking release of the records requested in its April 24, 2008 requests.  Defendants' response to plaintiffs' FOIA requests are set forth in detail in the declarations submitted herewith.  (Hackett decl. at ¶¶ 12-13, 15-20 (ODNI); Declaration of Melanie Ann Pustay at ¶¶ 10, 13-16, 39-42 ("Pustay decl.") (DOJ Office of Information and Privacy ("OIP"), on behalf of OAG, OLP, and OLA); Declaration of Paul P. Colborn at ¶¶ 5, 7-9, 12-15 ("Colborn decl.") (OLC); Declaration of Charles M. Steele at ¶¶ 9-12 ("Steele decl.") (NSD); Declaration of James M. Kovakas at ¶¶ 6-8 ("Kovakas decl.") (DOJ's Civil Division); Second Declaration of David M. Hardy at ¶¶ 5-6 ("Hardy decl.") (DOJ's FBI)).

The parties agreed to consolidate summary judgment briefing for the two cases.  (Civil Action No. 08-1023, dkt. # 59).  Plaintiff informed defendants that it is not challenging the adequacy of defendants' searches or defendants' (1) withholding of information related solely to the internal personnel rules and practices of the agencies based on Exemption 2 (also known as "low 2");[3] and (2) withholding of identifying information, such as names of low-level government employees, phone and fax numbers, the personal portion of email addresses of government employees used for official business, and the location of meeting rooms, regardless of the exemption claimed.

## ARGUMENT

### DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FOIA CLAIMS.

FOIA's "basic purpose" reflects a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989). "Congress recognized, however, that public disclosure is not always in the public interest." CIA v. Sims, 471 U.S. 159, 167 (1985). FOIA is designed to achieve

---

[3]  Exemption 2 protects from disclosure "matters that are ... related solely to the internal personnel rules and practices of an agency," including matters "in which the public could not reasonably be expected to have an interest" (low 2). Dep't of Air Force v. Rose, 425 U.S. 352, 369-70 (1976); Hiken v. DoD, 521 F. Supp. 2d 1047, 1059 (N.D. Cal. 2007).

1   a "workable balance between the right of the public to know and the need of the Government to keep

2   information in confidence to the extent necessary without permitting indiscriminate secrecy." John

3   Doe, 493 U.S. at 152.

4        To that end, FOIA mandates disclosure of government records unless the requested

5   information falls within one of nine enumerated exceptions. See 5 U.S.C. § 552(b). "A district

6   court only has jurisdiction to compel an agency to disclose improperly withheld agency records,"

7   i.e., records that do "not fall within an exemption." Minier v. CIA, 88 F.3d 796, 803 (9th Cir. 1996)

8   (emphasis in original); see also Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S.

9   136, 150 (1980). Despite the "liberal congressional purpose" of FOIA, the statutory exemptions

10  must be given "meaningful reach and application." John Doe, 493 U.S. at 152.

11       The Government bears the burden of proving that the withheld information falls within the

12  exemptions it invokes. 5 U.S.C. § 552(a)(4)(b). Where, as here, responsive records are withheld,

13  "[c]ourts are permitted to rule on summary judgment . . . solely on the basis of government affidavits

14  describing the documents sought." Lion Raisins v. USDA, 354 F.3d 1072, 1082 (9th Cir. 2004).

15  All that is required is that "the affiants [be] knowledgeable about the information sought" and that

16  "the affidavits [be] detailed enough to allow the court to make an independent assessment of the

17  government's claim." Id. The court may award summary judgment to an agency on the basis of

18  information provided in affidavits or declarations that describe "the justifications for nondisclosure

19  with reasonably specific detail, demonstrate that the information withheld logically falls within the

20  claimed exemptions, and show that the justifications are not controverted by contrary evidence in

21  the record or by evidence of . . . bad faith." Hunt v. CIA, 981 F.2d 1116, 1119 (9th Cir. 1992). "If

22  the affidavits contain reasonably detailed descriptions of the documents and allege facts sufficient

23  to establish an exemption, the district court need look no further." Citizens Comm'n on Human

24  Rights v. FDA, 45 F.3d 1325, 1329 (9th Cir. 1995) (internal quotations omitted).

25       I.      DEFENDANTS PROPERLY WITHHELD PURSUANT TO
                 EXEMPTION 5 RECORDS REFLECTING COMMUNICATIONS
26               BETWEEN ODNI OR DOJ OFFICIALS AND MEMBERS OF
                 CONGRESS OR THEIR STAFFS CONCERNING AMENDMENTS
27               TO FISA.

28       Plaintiff requested from ODNI and five DOJ components all records concerning briefings,

1    discussions or other exchanges that agency officials had with Members of Congress or their staffs

2    concerning amendments to FISA.  These highly deliberative and sensitive documents go to the heart

3    of a two-year process by which the Executive and Legislative Branches of the federal government

4    reached consensus on the FISA legislation – a controversial, complex subject of great national

5    importance.

6            The bulk of the responsive documents withheld by ODNI and DOJ pursuant to Exemption

7    5 consists of confidential email messages relating to the FISA reform legislation that Executive

8    Branch staff, including White House staff, exchanged with congressional staff, as well as with each

9    other.  In these emails, many of which attached draft legislation, members of the two Branches

10   discussed, analyzed, and negotiated possible amendments to FISA.  (See Turner decl. at ¶¶ 6, 8;

11   Hackett decl. at ¶ 26; Colborn decl. at ¶¶ 21; Pustay decl. at ¶¶ 52-53; Steele decl. at ¶ 25).  Among

12   other things, these emails sought and offered assistance and advice with respect to legislative

13   proposals to reform FISA and suggested and negotiated possible approaches to and modifications

14   of these legislative proposals; shared the substance of internal congressional deliberations regarding

15   FISA reform; and exchanged and commented on draft versions of legislation.  DOJ and ODNI staff

16   also exchanged email with each other and with other Executive Branch staff in preparation for, or

17   in order to deliberate on, these inter-Branch communications.  (See Declaration of Kenneth L.

18   Wainstein at ¶ 8 ("Wainstein decl."); Turner decl. at ¶ 8; Colborn decl. at ¶¶ 21, 26-27; Pustay decl.

19   at ¶¶ 52-56).  The Executive Branch staff involved in these email communications were acting to

20   assist the President with his participation in the FISA legislative process.  (See Meyer decl. at ¶ 3;

21   Colborn decl. at ¶¶ 19-20; Wainstein decl. at ¶ 12).  The documents constitute precisely the type of

22   information that Congress intended to shield from public disclosure by enacting FOIA's Exemption

23   5, which protects the quality, integrity and effectiveness of government decision-making and the

24   ability of the President and Congress to effectively discharge their constitutional responsibilities.

25           Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters

26   which would not be available by law to a party other than an agency in litigation with the agency."

27   5 U.S.C. § 552(b)(5).  The exemption covers documents "normally privileged in the civil discovery

28   context."  Nat'l Labor Relations Bd. v. Sears, Robuck & Co., 421 U.S. 132, 149 (1975); see also

Carter v. Dep't of Commerce, 307 F.3d 1084, 1088 (9th Cir. 2002).  The civil discovery privileges at issue here are the deliberative process privilege, the presidential communications privilege, and the attorney work-product doctrine.

    A. The Withheld Communications Satisfy Exemption Five's Inter-agency or Intra-agency Requirement.

   All of the withheld materials, including those documents that involve persons outside the Executive Branch, meet the Exemption 5 "inter-agency or intra-agency" requirement.  It is well-settled that Congress did not intend this threshold requirement to be understood in "rigidly exclusive terms, but rather to include any document that is part of the deliberative process." Ryan v. DOJ, 617 F.2d 781, 790 (D.C. Cir. 1980); see also Nat'l Institute of Military Justice v. DoD ("NIMJ"), 512 F.3d 677, 681 (D.C. Cir. 2008) ("[T]he pertinent element is the role, if any, that the document plays in the process of agency deliberations.") (internal quotation marks omitted); Berman v. CIA, 378 F. Supp. 2d 1209, 1219 (E.D. Cal. 2005) (quoting Ryan), aff'd on other grounds, 501 F.3d 1136 (9th Cir. 2007).  Accordingly, "a document need not be created by an agency or remain in the possession of the agency, in order to qualify as 'intra-agency.'" NIMJ, 512 F.3d at 684 (quoting Judicial Watch, Inc. v. Dep't of Energy ("DOE"), 412 F.3d 125, 130 (D.C. Cir. 2005)).

   For instance, "under well established case law," Exemption 5 applies to documents prepared by an agency and sent to the President or his advisers and their staffs, even though the President is not an "agency" for purposes of FOIA.  Berman, 378 F. Supp. 2d at 1219 (citing EPA v. Mink, 410 U.S. 73, 85 (1973)); see also DOE, 412 F.3d at 130-31 (holding that agency documents shared with or received from presidential advisory body, which did not qualify as an "agency" under FOIA, were "intra-agency" for purposes of the Exemption 5 threshold).   As the Berman court explained, "Congress exempted the President from the definition of an 'agency' under FOIA because it wanted to protect the President from the burdens and intrusions of FOIA, not because it sought to deny the President the protections afforded by the exemptions for information communicated to the President but retained in an agency file."  378 F. Supp. 2d at 1220.

   The same can be said of documents prepared by an agency and sent to Congress, which is similarly exempt from FOIA, 5 U.S.C. §§ 551(1)(A), 552(f):  "Congress exempted [itself] from the definition of an 'agency' under FOIA because it wanted to protect [itself] from the burdens and

intrusions of FOIA, not because it sought to deny [itself] the protections afforded by the exemptions for information communicated to [Congress] but retained in an agency file." Berman, 378 F. Supp. 2d at 1220. See also Rockwell Int'l Corp. v. DOJ, 235 F.3d 598, 604 (D.C. Cir. 2001) (holding that Executive Branch did not waive Exemption 5's deliberative process privilege by disclosing deliberative memorandum to Congress); Murphy v. Dep't of Army, 613 F.2d 1151, 1155-56 (D.C. Cir. 1979) (same). Thus, the very same emails at issue in this case residing in Congress's email systems are not subject to disclosure. (See Senate Legal Counsel ltr. at 2) ("In Congress's hands, these inter-branch deliberative communications are absolutely protected from disclosure."). Congress's purposes in exempting itself from FOIA would be frustrated by requiring disclosure of the copies of these emails that reside in the defendant agencies' email systems. See Goland v. CIA, 607 F.2d 339, 346 (D.C. Cir. 1978) ("It may be assumed that plaintiffs could not easily win release of the [House Committee] Hearing Transcript from the House of Representatives; we will not permit them to do indirectly what they cannot do directly because of the fortuity of the Transcript's location"); cf. Warth v. DOJ, 595 F.2d 521, 523 (9th Cir. 1979) ("[W]ere court documents deemed 'agency records' for purposes of the FOIA when held by DOJ, the [FOIA] would encroach upon the authority of the courts to control the dissemination of its documents to the public. We are convinced that Congress intended to preclude such encroachment by exempting the courts from the [FOIA's] disclosure requirements.").

Moreover, courts have specifically held that documents prepared by Members of Congress or their staffs and sent to an agency to assist in agency deliberations qualify as inter- or intra-agency. In Ryan, the D.C. Circuit held that documents prepared by United States senators and submitted to DOJ in response to a DOJ questionnaire about procedures for selecting and recommending judicial nominees were exempt from FOIA disclosure under Exemption 5. The court found that the withheld questionnaires were inter- or intra-agency documents even though the senators were not agencies within the meaning of Exemption 5, reasoning that "[t]he exemption was created to protect the deliberative process of the government, by ensuring that persons in an advisory role would be able to express their opinions freely to agency decision-makers without fear of publicity. In the course of its day-to-day activities, an agency often needs to rely on the opinions and recommendations of

1    temporary consultants, as well as its own employees.  Such consultants are an integral part of its

2    deliberative process; to conduct this process in public view would inhibit frank discussion of policy

3    matters and likely impair the quality of decisions." Ryan, 617 F.2d at 789-90 (citation footnote

4    omitted). See also Public Citizen, Inc. v. DOJ, 111 F.3d 168, 170 (D.C. Cir. 1997) (holding exempt

5    from disclosure records containing communications between former Presidents and executive

6    agencies because records were created for purpose of aiding agencies' deliberative process); Dow

7    Jones & Co. v. DOJ, 917 F.2d 571, 575 (D.C. Cir. 1990) (stating that Ryan stands "for the

8    proposition that Exemption 5 permits an agency to protect the confidentiality of communications

9    from outside the agency so long as those communications are part and parcel of the agency's

10   deliberative process").

11          The Supreme Court acknowledged this line of cases in Dep't of Interior v. Klamath Water

12   Users Protective Ass'n, 532 U.S. 1 (2001).  In Klamath, the Court held that documents submitted

13   by Native American tribes to the Bureau of Indian Affairs in an administrative water rights

14   adjudication were not intra-agency records for purposes of Exemption 5 because the tribes were

15   representing their own interests rather than advising the agency as consultants. 532 U.S. at 12.  The

16   Court noted that some courts had extended Exemption 5 to communications between government

17   agencies and outside consultants advising them, and took care not to overrule this line of cases,

18   including Ryan and Public Citizen.  Id. at 10, 12 n. 4.  The Court distinguished the consultant cases

19   on the ground that the tribes "necessarily communicate with the Bureau with their own, albeit

20   entirely legitimate, interests in mind" and, moreover, are "self-advocates" pursuing their own

21   interests "at the expense of others seeking benefits inadequate to satisfy everyone." Id. at 12; see

22   also id. at 12 n. 4.  Thus, "[f]airly read, the holding of Klamath is only that a communication from

23   an 'interested party' seeking a Government benefit 'at the expense of other applicants,' is not an

24   intra-agency record." Lardner v. DOJ, 2005 WL 758267 at * (D.D.C. Mar. 31, 2005) (quoting

25   Klamath).  Post-Klamath, "what matters is [still] whether a document will expose the pre-decisional

26   and deliberative processes of the Executive Branch." DOE, 412 F.3d at 131.[4]  This is especially true

27

28          [4]  Since Klamath, the D.C. Circuit and other courts have confirmed the continued validity
     of Ryan and the consultant cases.  See NIMJ, 512 F.3d at 684 (D.C. Cir. 2008); DOE, 412 F.3d at
     Defs' Notice of Consol. Mtn for Summary Judgment; Mem. in support thereof - C 08-2997 (JSW)          10

where, as here, the outside "consultant" is part of a coequal Branch of government.  See <u>Klamath</u>, 532 U.S. at 9-10 (quoting dissenters in <u>DOJ v. Julian</u>, 486 U.S. 1 (1988), for proposition that text and purpose of Exemption 5 are consistent with deeming a memorandum "intra-agency" that was "'received by an agency, to assist it in the performance of its own functions,'" from an "'<u>employee or officer of another governmental unit (not an agency) that is authorized or required to provide advice to the agency</u>'") (quoting <u>Julian</u>, 486 U.S. at 18 n.1 (Scalia, J., dissenting)) (emphasis added); <u>see also</u> <u>NIMJ</u>, 512 F.3d at 690 (where "outsiders" submitting comments are U.S. senators, it is more reasonable to consider those comments to be inter- or intra- agency) (Tatel, J., dissenting in case where majority otherwise agreed that <u>Klamath</u> did not disturb consultant line of cases).

The present case is analogous to <u>Ryan</u> and <u>Public Citizen</u>, in which the senators and former Presidents had their own independent interests in communicating with the agencies, but the communications were nonetheless deemed intra-agency because they informed the agencies' deliberative processes.  At issue here are confidential email communications that Executive Branch staff, including White House staff, exchanged with each other and with congressional staff in the course of developing compromise FISA reform legislation.  These communications reveal ODNI, DOJ, and other Executive Branch deliberations regarding the provision of highly classified information concerning foreign intelligence surveillance to Members of Congress and their staffs; the development of the President's positions on various legislative proposals; the development and recommendation to Congress of substantive and technical modifications to legislative language; and attempts to persuade Members of Congress and their staffs of the merits of the Administration's proposals and positions.  (See Wainstein decl. at ¶ 8; McConnell decl. at ¶¶ 18-20; Turner decl. at ¶ 8; Colborn decl. at ¶¶ 19-21, 26-27; Pustay decl. at ¶¶ 52-56).

Such communications constitute important informal channels for inter-Branch legislative deliberations that are separate from the formal, often public, mechanisms through which such

130-31; <u>Tigue v. DOJ</u>, 312 F.3d 70, 77-78 (2d Cir. 2002) (applying consultant corollary to find memorandum, which was solicited by commission acting as consultant to IRS, inter-agency communication); <u>Sakamoto v. EPA</u>, 443 F. Supp. 2d 1182, 1191 (N.D. Cal. 2006) (adopting reasoning of consultant corollary cases and concluding that documents authored by EPA consultants providing information and advice to EPA are intra-agency).

deliberations also take place.  As the successful enactment of the Protect America Act and the FISA Amendments Act demonstrates, these informal channels are integral to the joint deliberative process that Congress and the Executive Branch often engage in as they develop legislation.  (See Meyer decl. at ¶¶ 4, 10-12; McConnell decl. at ¶¶ 4, 19-22; Wainstein decl. at ¶¶ 7-11; Senate Legal Counsel ltr. at 1-2; Nov. 19, 2008 letter from Brian S. Morrison, the Acting Chief Counsel of the Permanent Select Committee on Intelligence of the House of Representatives, to Mr. Katsas at 1-2 ("House ltr."), attached as Ex. B to Meyer decl.).  The enactment of the FISA reform legislation also shows how these communications are an essential component of the Executive Branch's own deliberative processes, and are central to the assistance that Executive Branch staff provide the President in exercising his constitutional authorities relating to the enactment of legislation.  (See Meyer decl. at ¶ 4; Wainstein decl. at ¶¶ 7-11; Colborn decl. at ¶ 19-21, 26-27; Turner decl. at ¶ 8; Pustay decl. at ¶¶ 52-56).

The President's constitutional powers relating to the legislative process include his authorities to approve or disapprove enrolled bills passed by Congress (Article I, Section 7); request the opinions of Department heads (Article II, Section 2); and recommend to Congress "such measures as he shall judge necessary and expedient" (Article II, Section 3).  In exercising these authorities, the President, often through the assistance of Executive Branch staff, plays a significant role in the legislative process.  A substantial portion of legislation introduced in Congress originates with the President or an official of his Administration acting on his behalf, and after legislation has been introduced, the President often stays actively engaged in the legislative process.  (Meyer decl. at ¶ 9; Senate Legal Counsel ltr. at 1-2; House ltr. at 1-2).  Through confidential email communications exchanged outside the formal legislative process, staff from the White House and the departments and agencies of the Executive Branch share ideas, advice and assistance, and negotiate with Members of Congress and congressional staffers on behalf of the President.  (Meyer decl. at ¶¶ 11, 14).

The deliberative nature of the communications at issue is underscored by the fact that those participating in the communications believed them to be confidential, thereby allowing them to negotiate and exchange ideas freely and frankly.  (See Meyer decl. at ¶ 15; Wainstein decl. at ¶ 11).

1    Unquestionably, the possibility of public dissemination of these confidential and sensitive

2    communications exchanged between Executive Branch and congressional staff would have severely

3    chilled the candor, objectivity, and effectiveness of their conversations.  (McConnell decl. at ¶ 22;

4    Wainstein decl. at ¶ 11; Meyer decl. at ¶ 17; Senate Legal Counsel ltr. at 2-3; House ltr. at 2).  These

5    informal consultations were "an integral part of [the agencies'] deliberative process" and are

6    properly considered intra-agency documents for purposes of Exemption 5.  Ryan, 617 F.2d at 789.

7         In addition to these considerations, the principle of constitutional avoidance provides a

8    further reason to conclude that the withheld records satisfy the Exemption 5 threshold requirement.

9    See Public Citizen v. DOJ, 491 U.S. 440, 466 (1989).  A court's "reluctance to decide constitutional

10   issues" should be "especially great where, as here, they concern the relative powers of coordinate

11   branches of government."   Id.  "[I]n formulating legislative proposals," and in exercising his

12   constitutional authorities regarding the enactment of legislation generally, "the President must be

13   free to seek confidential information from [government] sources," In re Cheney, 406 F.3d 723, 728

14   (D.C. Cir. 2005) (en banc), including from Congress.  Requiring FOIA disclosure of many of the

15   communications at issue in this case "'would potentially inhibit the President's freedom to

16   investigate, to be informed, to evaluate, and to consult during the [legislative] process,'" Public

17   Citizen, 491 U.S. at 488 (Kennedy, J., concurring) (quoting district court opinion); cf. id at 466

18   (deeming it "undeniable" that "construing [the Federal Advisory Committee Act] to apply to the

19   Justice Department's consultations with the ABA committee [that advised the Attorney General on

20   the qualifications of prospective federal judicial nominees] would present formidable constitutional

21   difficulties"), as well as his freedom to act in the legislative process through his Executive Branch

22   agents.  As explained below, constitutionally-based privileges protect the withheld documents.  A

23   construction of the Exemption 5 threshold requirement to preclude reliance on these privileges

24   would at minimum present serious separation of powers difficulties, and indeed would, we believe,

25   render FOIA as applied unconstitutional.  See Mink, 410 U.S. at 83 ("Executive privilege may" "

26   impose [limitations] upon . . . congressional ordering" in FOIA); Ass'n of Am. Physicians and

27   Surgeons, Inc. v. Clinton, 997 F.2d 898, 910 (D.C. Cir. 1993) ("FOIA's exemption [for the

28   President's immediate personal staff] may be constitutionally required to protect the President's

executive powers").

B.     The Withheld Communications Are Protected From Disclosure by
the Deliberative Process Privilege.

Records are covered by the deliberative process privilege if they are "predecisional in nature" and form "part of the agency's deliberative process." Maricopa Audubon Soc'y v. U.S. Forest Serv., 108 F.3d 1089, 1092 (9th Cir. 1997) (internal quotations omitted). "A 'predecisional' document is one 'prepared in order to assist an agency decisionmaker in arriving at his decision,' and may include 'recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.'" Maricopa, 108 F.3d at 1093 (quoting Assembly of the State of Cal. v. U.S. Dep't of Commerce, 968 F.2d 916, 920 (9th Cir. 1992)). "A predecisional document is part of the 'deliberative process,' if 'the disclosure of [the] materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.'" Id

Many of the records requested by plaintiff are quintessentially pre-decisional and deliberative because they consist of communications within the Executive Branch, or between high-level Executive Branch officials in policy-oriented positions and Members of Congress or their staffs, concerning proposed, hotly debated FISA amendments. In specific part, ODNI withheld email messages between ODNI officials (including the Office of Legislative Affairs and the Office of the General Counsel), DOJ and NSA officials, and Congressional staff (including staff working for the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence) that include substantive discussions regarding the various FISA reform proposals being introduced. The emails often attached draft legislation that was edited and then sent back and forth between Congressional staffers and ODNI or DOJ staff, reflecting substantive comments and input. These email exchanges were frank discussions of the pros and cons of various proposals and of specific language. (Turner decl. at ¶¶ 6, 8; Hackett decl. at ¶¶ 26, 30-31; McConnell decl. at ¶¶ 19-22; ODNI Vaughn index). The emails also discussed the substance of meetings on FISA reform proposals and officials' candid assessments of those meetings. Senior ODNI officials were regularly making decisions regarding how best to work with Congress on this legislation and how the

legislation should be framed. These emails were part of that ongoing deliberative process that preceded final passage of the amendments. (Turner decl. at ¶¶ 6-8). Similarly, ODNI withheld pursuant to the deliberative process privilege memorandums for the record that were created by ODNI staff when they returned from meetings or briefings with Congress. They include the authors' assessments of the meetings and deliberations about which parts or aspects of the meetings were most important. (Hackett decl. at ¶ 36-38).

DOJ's National Security Division likewise withheld pre-decisional, deliberative emails between NSD officials and officials from other DOJ components, other Executive Branch officials, and/or congressional members and staff regarding the FISA amendments; draft legislation transmitted between Congress and NSD; draft talking points, congressional question and answers, and notes. As the lead DOJ component working with Congress on the FISA amendments, NSD staff communicated frequently with other Executive Branch officials and congressional staff from the beginning of the legislative process through the enactment of the FISA Amendments Act of 2008 in July, 2008. (See Steele decl. at ¶¶ 23-31; Wainstein decl. at ¶¶ 7-11; NSD Vaughn index).

Informal confidential communication via email was also an integral part of the deliberations within OLC and the Executive Branch, and between OLC attorneys and Congress, in connection with the development of the FISA legislation. OLC attorneys routinely sent and received emails that conveyed informal but substantive advice, analysis, and reactions to legal or constitutional issues implicated by the proposed legislation or to the legislative process itself. They also sent and received emails discussing congressional requests for classified FISA court orders and related materials, which Members of Congress viewed as crucial to their legislative deliberations with respect to FISA reform. OLC emails reflected a fluid and evolving exchange of ideas, both within the Executive Branch and between OLC and Congress. (Colborn decl. at ¶¶ 21, 25-27). Drafts of proposed FISA reform legislation withheld by OLC pursuant to the deliberative process privilege are also predecisional and deliberative. (Colborn decl. at ¶ 28). Finally, classified attorney notes withheld by OLC reflect the thoughts and impressions of an OLC attorney concerning ongoing discussions with Members of Congress regarding the proposed FISA reform legislation and therefore fall within the deliberative process privilege. (Colborn decl. at ¶ 29).

1    Email messages withheld by OIP pursuant to the deliberative process privilege were sent to,

2    or sent by, officials in the Office of the Attorney General, OLA or OLP, as they worked with other

3    officials on the development of the FISA amendments.  These emails either summarized a draft

4    document that was attached, or the content of the email had draft language that was circulated to a

5    large number of officials for review and comment.  Each of these email messages was a pre-

6    decisional document, reflecting the deliberations among DOJ officials, between DOJ officials and

7    other Executive Branch staff, or between DOJ officials and congressional staff, which all took place

8    before final action on the FISA amendments.  These informal, confidential communications were

9    part of the exchange of ideas and suggestions that accompanies all decision-making and reflect

10   preliminary assessments by attorneys and other staff about issues in which they have been asked to

11   make recommendations and provide advice.  OIP also withheld draft legislative language under

12   discussion that circulated among DOJ officials for review and comment, a draft letter from the

13   Attorney General and Director of National Intelligence to Members of Congress, talking points used

14   to brief officials and prepare them to answer questions, and handwritten notes taken by OLA

15   officials during meetings with congressional staff regarding amendments to the FISA.  (Pustay decl.

16   at ¶¶ 50-64).

17                                             * * * * *

18   Compelled disclosure of these confidential, pre-decisional, and deliberative documents

19   would chill the free and candid discussions among Executive Branch officials and congressional

20   staffers that are critical to providing accurate and useful advice to the Executive Branch and

21   assisting the President with his legislative functions.  As the Supreme Court has observed, Congress

22   recognized in enacting FOIA that "the 'frank discussion of legal or policy matters' in writing might

23   be inhibited if the discussion were made public; and [] the 'decisions' and 'policies formulated'

24   would be the poorer as a result." Sears, Roebuck & Co., 421 U.S. at 150 (quoting S. Rep. No. 813,

25   at 9).  In particular, "human experience teaches that those who expect public dissemination of their

26   remarks may well temper candor with a concern for appearances and for their own interests to the

27   detriment of the decisionmaking process." United States v. Nixon ("Nixon I"), 418 U.S. 683, 705

28   (1974).  In the context of inter-Branch legislative deliberations, it is likely that candid and frank

1 discussion would be inhibited by concern about the possibility of embarrassment or incurring the

2 disapprobation of the public or other participants in the legislative process.  (See Meyer decl. at ¶

3 17).

4      These observations about the chilling effect of the threat of public disclosure apply with

5 particular force here, where plaintiff requested, and could have received and made public, these

6 communications while delicate inter-Branch negotiations relating to the FISA amendments were on-

7 going.  The Director of National Intelligence attests that "the possibility of public dissemination of

8 the necessarily confidential and sensitive communications exchanged between Executive Branch

9 and congressional staff with respect to these subjects would have severely compromised the candor,

10 objectivity, and effectiveness of their conversations."  Indeed, his "firm belief" is that "the resulting

11 legislative compromise would not have been achieved, or at least would have been delayed even

12 longer than it was, had those engaged in the informal, non-public inter-Branch communications at

13 issue in this case believed that their communications would be disclosed pursuant to the FOIA."

14 (McConnell decl. at ¶ 22).

15      Mr. Meyer, the Assistant to the President for Legislative Affairs, confirms that disclosure

16 of these emails would chill inter-Branch deliberations in the future, especially with respect to

17 matters like the FISA amendments that are highly controversial and politically charged.  (Meyer

18 decl. at ¶¶ 17, 21; see also Wainstein decl. at ¶ 11).  The Director of ODNI's Office of Legislative

19 Affairs, who was heavily involved in the effort to achieve FISA reform, attests that "[t]he mere

20 possibility that these records might be disclosed already has caused some ODNI and congressional

21 staff to be far more circumspect in their communications with each other and to use email less than

22 they otherwise would out of concern that anything they write might ultimately be publicly

23 disclosed."  (Turner decl. at ¶ 12).  The Senate Legal Counsel, on behalf of the bipartisan Senate

24 leadership, shares these concerns:  "Chilling the use of email exchanges in [this] context by making

25 them public, conceivably while legislative proposals are pending and sensitive expressions of

26 tentative views are underway, could have deleterious effects on both the quality and the timeliness

27 of government decision-making on legislative matters – the very effects that Congress sought to

28 ameliorate in enacting Exemption 5."  (Senate Legal Counsel ltr. at 3).  (See also House ltr. at 2,

Defs' Notice of Consol. Mtn for Summary Judgment; Mem. in support thereof - C 08-2997 (JSW)      17

1  stating concern that disclosure of documents at issue will "chill the overall inter-branch deliberative
2  process").

3          C.       The Withheld Communications Are Protected From
                    Disclosure by the Presidential Communications
4                   Privilege.

5          FOIA Exemption 5 incorporates the presidential communications privilege. <u>Judicial Watch</u>
6  <u>v. DOJ</u>, 365 F.3d 1108, 1113 (D.C. Cir. 2004); <u>Loving v. DoD</u>, 496 F. Supp. 2d 101, 106 (D.D.C.
7  2007); <u>Berman</u>, 378 F. Supp. 2d at 1219.  The privilege is a "[p]resumptive privilege for Presidential
8  communications . . . [that is] fundamental to the operation of Government and inextricably rooted
9  in the separation of powers under the Constitution."  <u>Nixon I</u>, 418 U.S. at 708.  This privilege
10 "flow[s] from the nature of enumerated powers" of the President.  <u>Id</u>. at 705 & n.16.  As observed
11 by the Court of Appeals for the District of Columbia Circuit, "[a]t core, the presidential
12 communications privilege is rooted in the President's need for confidentiality in the communications
13 of his office . . . in order to effectively and faithfully carry out his Article II duties and to protect the
14 effectiveness of the executive decision–making process." <u>Judicial Watch</u>, 365 F.3d at 1115 (internal
15 quotation marks and citations omitted).

16         The Supreme Court "found such a privilege necessary to guarantee the candor of presidential
17 advisers and to provide '[a] President and those who assist him * * * [with] free[dom] to explore
18 alternatives in the process of shaping policies and making decisions and to do so in a way many
19 would be unwilling to express except privately.'"  <u>In re Sealed Case</u>, 121 F.3d 729, 743 (D.C. Cir.
20 1997) (quoting <u>Nixon I</u>, 418 U.S. at 708); <u>see also</u> <u>Berman</u>, 378 F. Supp. 2d at 1219.  See <u>Nixon v.</u>
21 <u>Administrator of General Services</u> ("<u>Nixon II</u>"), 433 U.S. 425, 448-49 (1977) ("'Unless he can give
22 his advisers some assurance of confidentiality, a President could not expect to receive the full and
23 frank submissions of facts and opinions upon which effective discharge of his duties
24 depends'")(citation omitted).  The privilege "is 'limited to communications "in performance of [a
25 President's] responsibilities" "of his office," and made "in the process of shaping policies and
26 making decisions."'" <u>Berman</u>, 378 F. Supp. 2d at 1219 (quoting <u>Nixon II</u>, 433 U.S. at 449).  It
27 applies to documents in their entirety, and covers final and post-decisional materials as well as pre-
28 deliberative ones.  <u>In re Sealed Case</u>, 121 F.3d at 745; <u>Berman</u>, 378 F. Supp. 2d at 1219.

1          Communications between Executive and Legislative Branch officials concerning the FISA

2   amendments were part of the process of shaping policies and making decisions in the performance

3   of the President's legislative responsibilities, see Meyer decl. at ¶¶ 8, 21, and are therefore protected

4   from disclosure by the presidential communications privilege. Berman, 378 F. Supp. 2d at 1219.

5   The privilege protects documents consisting of communications that were authored, or solicited and

6   received by, White House advisers who had broad and significant responsibility for assisting the

7   President on the official government matters to which the communications relate, as well as the

8   staffs of such advisers. In re Sealed Case, 121 F.3d at 751-52, 758. This is especially true when the

9   matters involve the President's exercise of quintessential and non-delegable powers, such as those

10   relating to the enactment of legislation. See id. at 751-52. A number of the documents at issue in

11   this case fall within this category. (See Turner decl. at ¶ 6; Hackett decl. at ¶¶ 26, 30, 45; ODNI

12   Vaughn index; Pustay decl. at ¶ 65; Colborn decl. at ¶ 32; Steele decl. at ¶ 14; NSD Vaughn index,

13   Group 2).[5] The White House advisers involved in these communications acted as the President's

14   advisers and agents with respect to the development of the FISA legislation, providing the President

15   with advice and recommendations, and deliberating and negotiating on his behalf. These advisers

16   were either responsible for gathering information and formulating advice and recommendations, and

17   conveying information and legislative approaches and strategies to staff within the Executive Branch

18   agencies, or they served as staff for advisers and agents who held these responsibilities. (Meyer

19   decl. at ¶ 22). The communications that these White House staff received contained information

20   regarding developments in the legislative process and facts predicate to the staff's provision to the

21   President of advice and recommendations concerning his possible actions in furtherance of his

22   legislative responsibilities, and specifically, his direction of the involvement of Executive Branch

23   agency personnel in the legislative process. (Id.).

24          More broadly, the presidential communications privilege also applies to communications

25   authored or received by ODNI and/or DOJ officials serving as the President's advisers and agents

26

27

28

---

[5] There is no requirement that the President personally invoke the presidential communications privilege in a FOIA case. Loving, 496 F. Supp. 2d at 108; Berman, 378 F. Supp. 2d at 1220-21; Lardner, 2005 WL 758267 at * 6.

in connection with deliberating and negotiating the FISA amendments. The communications concerning the FISA amendments that ODNI and DOJ have withheld under the presidential communications privilege were made on behalf of the President and in connection with his legislative functions. (Wainstein decl. at ¶ 12; Colborn decl. at ¶ 32; Kovakas decl. at ¶¶ 9, 12-13; Steele decl. at ¶¶ 33-34; Pustay decl. at ¶¶ 65-66). As set forth in the Meyer declaration, Mr. Meyer and the White House Deputy Chief of Staff for Policy, Joel D. Kaplan (as well as other White House staff), directed and coordinated staff in the departments and agencies in their inter-Branch deliberations regarding FISA reform, in particular through their participation in regular conference calls with staff at ODNI, DOJ, and the White House. (Meyer decl. at ¶ 8). During these calls, participants discussed the emerging legislative approach to FISA reform, the legislative process, and negotiation strategy, and received the President's direction and advice on how to proceed with the coordinated effort to deliberate and negotiate with Members of Congress and congressional staff. Mr. Kaplan conveyed some of the information learned during these calls to the President directly, and used the information to formulate advice to assist the President's decisionmaking with respect to the FISA reform legislation. (Id.). Public disclosure of the positions and strategies adopted by these individuals in their communications with Congress would reveal the positions and strategies of the President. (Meyer decl. at ¶ 21; Wainstein decl. at ¶ 13).

Simply because these advisers and presidential agents did not reside organizationally in the White House should not negate the privilege over communications that otherwise qualify. It furthers the privilege's purposes to apply it to confidential communications authored, solicited, and received by members of the Executive Branch in the course of performing their function of assisting the President with respect to pending legislative matters, including by serving as the President's agents in legislative deliberations. The President's authorities under the Presentment Clauses and the Recommendations Clause – the provisions that confer constitutional authority on the President with respect to the legislative process – are "quintessential" and "nondelegable." In re Sealed Case, 121 F.3d at 752. Only the President can directly exercise these authorities. See U.S. Const. art. I, § 7, cls. 2 & 3; id. at art. II, § 3, cl. 1. As a result, any advice prepared by Executive Branch officials on whether the President should veto or sign pending legislation, or whether he should make particular

legislative recommendations, is ultimately for the President's use.  Likewise, Executive Branch officials necessarily undertake any discussions or negotiations with congressional staffers relating to the development of pending legislation solely on the President's behalf.  (Meyer decl. at ¶ 12).  Because the documents at issue here were created solely to assist the President's deliberations on FISA reform and to facilitate his discharge of his legislative authorities, "there is assurance that . . . [they] . . . are intimately connected to his presidential decisionmaking."  In re Sealed Case, 121 F.3d at 753.

This case presents a particularly compelling example of the need to protect the confidentiality of inter-Branch deliberations that relate to the legislative process, since, as discussed above, it was only through confidential negotiations and deliberations that Congress and the President could reach a compromise legislative reform solution with respect to foreign intelligence – an area of vital national importance – that balanced potentially conflicting national security and civil liberties interests.  (McConnell decl. at ¶ 22; Wainstein decl. at ¶¶ 7-11).  See In re Sealed Case, 121 F.3d at 753.  It was particularly important to involve ODNI and DOJ staff in these confidential communications because of the highly technical and complex nature of FISA reform.  Unlike the President's White House staff who are limited in number and are usually generalists, ODNI and DOJ staff possess deep, specialized knowledge critical to FISA reform.  (Meyer decl. at ¶¶ 13-14; Wainstein decl. at ¶ 10).  Application of the presidential communications privilege to these communications allows ODNI and DOJ officials to give the President the benefit of their expertise without fear that their communications and deliberations will be disclosed to the public simply because they are not on the White House staff.

It is true that in Judicial Watch v DOJ, the D.C. Circuit held in a split decision that the presidential communications privilege did not apply to those documents produced by an Executive Branch agency in the course of advising the President with respect to his exercise of his pardon power that were not "'solicited and received'" by either the President or his immediate White House advisers in the Office of the President (or their staffs).  365 F.3d at 1114 (quoting In re Sealed Case, 121 F.3d at 752).  However, the holding in Judicial Watch is a narrow one, tailored to the precise circumstances presented – the preparation of documents by the President's advisers within DOJ "in

1   the course of developing the Deputy Attorney General's pardon recommendations for the President,"

2   365 F.3d at 1114; <u>see also id</u>. at 1112 – and based on rationales particular to those circumstances,

3   <u>see</u>, <u>e.g.</u>, <u>id</u>. at 1115 ("because pardon documents obtained from other agencies by Justice

4   Department staff undergo various stages of intermediate review before pardon recommendations are

5   submitted for consideration by the President and his immediate White House advisers, with some

6   documents never making their way to the Office of the President, the same confidentiality and

7   candor concerns calling for application of the presidential communications privilege in <u>Nixon</u> I and

8   II and <u>In re Sealed Case</u> do not apply as forcefully here"); <u>see also id</u>. at 1118, 1122.

9           <u>Judicial Watch</u> should not be read as purporting to fully resolve the privilege analysis in all

10   circumstances involving Executive Branch communications made with the sole purpose of assisting

11   the President in the performance of his core constitutional functions.  Such a broad reading would

12   be improper in this case, which involves the communications of Executive Branch staff serving as

13   the President's agents (as well as his advisers), at his general direction and with the benefit of his

14   advice (conveyed through White House staff), in deliberations with the Legislative Branch.  (Meyer

15   decl. at ¶¶ 8, 12).  By thus directly revealing the substance of the President's deliberations and

16   decision-making (<u>id</u>. at ¶ 21), disclosure in this case would pose a greater threat to the President's

17   effectiveness and discretion than did disclosure of the communications at issue in <u>Judicial Watch</u>,

18   which involved the communications of the President's Executive Branch <u>advisers</u> only.  365 F.3d

19   at 1117 (declining to consider Executive Branch documents created for the sole purpose of advising

20   the President, but that never reach the Office of the President, to be "'close enough to the President

21   to be revelatory of his deliberations'").

22           Moreover, this Court is not bound to follow the reasoning of <u>Judicial Watch</u>, which we

23   believe was wrongly decided.  The fundamental purpose of the presidential communications

24   privilege is to preserve the confidentiality necessary for the President to carry out his constitutional

25   duties.  <u>See</u> <u>Nixon II</u>, 433 U.S. at 448-49.  As the Supreme Court recognized in <u>Nixon I</u>, by

26   preserving the confidentiality of the President's communications and those of his advisers who

27   participate in the presidential decisionmaking process, the privilege enhances the quality of

28   presidential decisionmaking. 418 U.S. at 705, 708. As ably explained by Judge Randolph in dissent

in <u>Judicial Watch</u>, drawing a line based on the physical location of presidential advisers – i.e., whether or not they are located in the White House – subverts this rationale. <u>See</u> <u>Judicial Watch</u>, 365 F.3d at 1137 (Randolph, J., dissenting ) (criticizing majority's reliance on "an organizational chart"). A functional approach to applying the presidential communications privilege is far better: as information is "generated in the course of advising" or otherwise assisting "the President in the exercise of . . . a quintessential and nondelegable Presidential power," <u>In re Sealed Case</u>, 121 F.3d at 752, "[i]t follows that the information and documents, as well as the final recommendation, are privileged." <u>Judicial Watch</u>, 365 F.3d at 1137 (Randolph, J., dissenting).

II.    RECORDS CONCERNING COMMUNICATIONS BETWEEN ODNI AND DOJ OFFICIALS AND REPRESENTATIVES OF TELECOMMUNICATIONS COMPANIES, REGARDING AMENDMENTS TO FISA, ARE ALSO PROTECTED FROM DISCLOSURE PURSUANT TO EXEMPTION 5.

ODNI and DOJ properly withheld documents responsive to plaintiff's requests for all records concerning communications between ODNI or DOJ officials and representatives of telecommunications companies concerning amendments to FISA, pursuant to FOIA's Exemption 5. (Hackett decl. at ¶¶ 40, 44-45; Colborn decl. at ¶¶ 23-24; Kovakas decl. at ¶¶ 10-11, 14-20; Steele decl. at ¶¶ 14, 31, 36; NSD Vaughn index, Group 8). ODNI and DOJ also properly withheld records responsive to plaintiff's requests for records concerning any communications, regardless of subject matter, between ODNI or DOJ officials and certain individuals plaintiff alleges are lobbyists for telecommunications companies, pursuant to Exemption 5. (<u>See</u> Colborn decl. at ¶ 24).

A.    <u>These Communications Meet the Inter-agency or Intra-agency Requirement of Exemption 5 and are Protected from Disclosure by the Common Interest Privilege</u>.

Records involving communications between ODNI or DOJ officials and representatives or agents of telecommunications carriers concerning the FISA amendments satisfy the Exemption 5 inter- or intra-agency threshold requirement because the telecommunications carriers and DOJ shared common interests in the litigation against telecommunications carriers, which was intertwined with the legislation amending the FISA. <u>See</u> <u>Hunton & Williams, LLP v. DOJ</u>, 2008 WL 906783 at * 5 (E.D. Va. Mar. 31, 2008) (holding that if documents exchanged between DOJ and non-government entity satisfy the requirements of the common interest privilege, that is sufficient

to create an inter-agency or intra-agency relationship for purposes of Exemption 5).

The common interest privilege, also called the joint defense privilege, protects communications between parties and their lawyers who share a common interest in litigation. See In re Grand Jury Subpoenas: Under Seal, 415 F.3d 333, 341 (4th Cir. 2005); Waller v. Financial Corp. of America, 828 F.2d 579, 583 n. 7 (9th Cir.1987); Hunton & Williams, 2008 WL 906783 at * 5. The purpose of the privilege is "to allow persons with a common interest to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims." In re Grand Jury Subpoenas: Under Seal, 415 F.3d at 341. The common interest privilege has long been recognized by the Ninth Circuit. See Waller, 828 F.2d at 583 n. 7 (citing Hunydee v. United States, 355 F.2d 183 (9th Cir. 1965); Continental Oil Co. v. United States, 330 F.2d 347 (9th Cir. 1964)).

"The common interest privilege . . . applies where (1) the communication is made by separate parties in the course of a matter of common interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived." United States v. Bergonzi, 216 F.R.D. 487, 495 (N.D. Cal. 2003). There need not be a complete unity of interest among the participants. Id. The common interest must be a legal one, and the communication must be designed to further that particular legal interest. See Berger v. Seyfarth Shaw LLP, 2008 WL 4681834 at * 2 (N.D. Cal. Oct. 22, 2008); Nidec Corp. v. Victor Co. of Japan, 249 F.R.D. 575, 578 (N.D. Cal. 2007). The privilege clearly applies to co-defendants. Waller, 828 F.2d at 583 n. 7; Berger, 2008 WL 4681834 at * 2; Nidec Corp., 249 F.R.D. at 578.

Beginning on February 22, 2006, more than 40 class action complaints were filed in numerous district courts against various telecommunications companies, alleging that the companies provided unlawful assistance to the government following the attacks of September 11, 2001. These cases were a matter of significant concern to the United States for a number of reasons, among them the risk of unauthorized disclosure of certain intelligence activities, information, sources, and methods, as well as the risk that private companies might be less willing to assist intelligence activities due to concern about the prospect of facing burdensome legal claims. (Nichols decl. at ¶¶ 4-5). Accordingly, on May 13, 2006, the United States successfully moved to intervene in the first

1   case that had been filed against a telecommunications company, <u>Hepting v. AT&T Corp.</u>, No. 06-

2   0672 (N.D. Cal.).  The United States also moved to intervene in other cases, and on August 9, 2006,

3   all of the lawsuits against telecommunications carriers were transferred to a single district court for

4   consolidated pretrial proceedings.  <u>See</u> <u>In re National Sec. Agency Telecommunications Records</u>

5   <u>Litig.</u>, 444 F. Supp. 2d 1332 (J.P.M.L. 2006).  (<u>See</u> <u>also</u> Nichols decl. at ¶¶ 5-7).  The United States

6   furthermore sued various states to enjoin their investigations into whether certain

7   telecommunications carriers had assisted the government in alleged unlawful intelligence activities.

8   Those lawsuits, as well, were consolidated into the multi-district litigation, as were several lawsuits

9   filed directly against the government for alleged unlawful surveillance.  (Nichols decl. at ¶¶ 10-13).

10          Lawyers for the government and the telecommunications carriers recognized that they shared

11   common interests at the outset of the litigation.  Shortly after the filing of the <u>Hepting</u> case in

12   February 2006, lawyers from DOJ met with inside and outside counsel for AT&T, which at that time

13   was the only telecommunications carrier that had been named as a defendant.  During that meeting,

14   the participants expressly agreed that exchanges of information among Executive Branch lawyers

15   and lawyers for AT&T would be privileged under the common interest privilege.  (Nichols decl. at

16   ¶ 22).  Thereafter, as additional lawsuits were filed against other telecommunications companies,

17   lawyers from the Executive Branch communicated frequently with lawyers from those companies.

18   In subsequent meetings involving those additional defendants, the participants expressly agreed that

19   exchanges of information among Executive Branch lawyers and lawyers for these

20   telecommunications companies would be privileged under the common interest privilege.

21   Accordingly, to the extent that lawyers from the Executive Branch communicated in writing with

22   lawyers for telecommunications companies, those communications often bore the notations

23   "Privileged & Confidential" and/or "Subject to Common Interest Privilege."  (<u>Id</u>.).

24          A legislative grant of protection from civil actions for the telecommunications carriers would

25   clearly have an immediate and substantial impact on the cases consolidated in <u>In re National Sec.</u>

26   <u>Agency Telecommunications Records Litig</u>.  For that reason, lawyers from the Executive Branch

27   communicated with lawyers for certain telecommunications carriers about the possibility of such

28   legislation and how it would affect the pending cases, and it is those communications that are at

issue in this case.  A number of these communications were designated as privileged and confidential and subject to the common interest privilege.  (Nichols decl. at ¶ 23).  These participants shared a common interest in the impact of the FISA amendments on the pending litigation, and the communications between the participants about the FISA amendments furthered that specific legal interest.  See Berger, 2008 WL 4681834 at * 2; Nidec Corp., 249 F.R.D. at 578; Bergonzi, 216 F.R.D. at 495.  Moreover, lawyers for the government and the telecommunications companies orally agreed to confidentially communicate with each other in connection with the litigation pursuant to the common interest privilege.  See Hunton & Williams, 2008 WL 906783 at * 7 (finding that an oral agreement may provide the basis for establishing the existence of a common interest agreement). Accordingly, the withheld communications between ODNI or DOJ officials and representatives of telecommunications companies about the FISA amendments meet the Exemption 5 threshold requirement pursuant to the common interest doctrine.  See id. at * 5.

> **B.**     **The Withheld Communications Are Protected From Disclosure by the Attorney Work Product Doctrine.**

The attorney work product doctrine protects from disclosure "documents and tangible things prepared by a party or his representative in anticipation of litigation." In re Grand Jury Subpoena (Mark Torf/Torf Environmental Management), 357 F.3d 900, 906 (9th Cir. 2004). These documents include "the files and the mental impressions of an attorney . . .  reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways."  Hickman v. Taylor, 329 U.S. 495, 510-11 (1947).  The doctrine, thus, protects information generated by legal counsel where "the document can fairly be said to have been prepared or obtained because of the prospect of litigation."[6] In re Grand Jury Subpoena, 357 F.3d at 907; see Feshbach, 5 F. Supp. 2d at 782.

The Civil Division withheld email exchanges between Civil Division attorneys representing the United States in the In Re National Security Agency Telecommunications Records Litigation case and counsel for co-defendant telecommunication companies, in which attorneys provided legal

---

[6] Because the work product doctrine in the FOIA context is absolute, "there is no obligation to segregate factual from deliberative material where documents are withheld pursuant to the attorney work product privilege."  Feshbach v. SEC, 5 F. Supp. 2d 774, 783 (N.D. Cal. 1997).

analysis of FISA reform proposals and their impact on the litigation.  The communications reflect the legal analysis and legal reasoning of attorneys defending the pending litigation.  (Kovakas decl. at ¶¶ 10-11, 23).  The Civil Division also withheld emails among counsel for co-defendants discussing the scheduling of meetings on the FISA legislation.  Disclosure of these emails would reveal Civil Division attorney work product by identifying who government counsel met with to discuss litigation strategy and the subject of those meetings.  (Id. at ¶¶ 14-20).  Because all documents withheld by the Civil Division pursuant to the attorney work product privilege reflect the thoughts, opinions, planning and legal reasoning of agency attorneys and co-party counsel in litigation, they fall within the bounds of the attorney work product privilege and  were therefore properly withheld under Exemption 5.  (Kovakas decl. at ¶ 23).  (See also Steele declaration at ¶ 31 and NSD Vaughn index (NSD documents); Hackett decl. at ¶¶ 40, 44-45 (ODNI documents)).

Similarly, OLC withheld a small number of documents in full or in part that constitute the legal deliberations and reflect the legal analysis and reasoning of attorneys in contemplation of pending litigation and are therefore protected as attorney work product.  These communications include (1) email communications exchanged between Executive Branch staff, including OLC attorneys, and counsel for telecommunications companies that are defendants in the suits described above and that share a common interest with the United States, and (2) intra-Executive Branch emails discussing the substance of communications between an OLC attorney and counsel for telecommunications companies that are defendants in the suits.  (Colborn decl. at ¶¶ 23-24).  The documents at issue reflect the thoughts of attorneys about legal issues, including issues related to the pending FISA reform legislation and its impact on the litigation.  Because the documents reflect the legal reasoning of agency attorneys and co-party counsel relating to pending litigation, they clearly fall within the traditional meaning of attorney work product and are exempt from public disclosure under the attorney work-product doctrine.  (Id. at ¶¶ 23-24, 35).

C.   The Withheld Communications Are Protected from
Disclosure by the Deliberative Process Privilege and
the Presidential Communications Privilege.

Records reflecting communications between ODNI and/or DOJ officials and representatives of telecommunications carriers about amendments to FISA, and their impact on the litigation in

which the United States and telecommunications carriers are co-defendants, reflect presidential decisionmaking and pre-decisional deliberations of agency officials.  They are therefore protected from disclosure by the deliberative process privilege and the presidential communications privilege.

Like the records reflecting communications between ODNI or DOJ officials and Members of Congress and their staffs concerning amendments to FISA, these communications were made by Executive Branch officials acting as the President's advisers and agents relating to the development of FISA reform legislation and its impact on the pending litigation against private telecommunications companies alleged to have helped the government gather intelligence after September 11, 2001.  (See Meyer decl. at ¶ 23; Kovakas decl. at ¶¶ 10-11, 14-20; Colborn decl. at ¶ 32; Hackett decl. at ¶¶ 40, 44-45).  The legislation and the litigation were inextricably intertwined – the legislation had the potential to bar the lawsuits.  By revealing the information gathering efforts of Executive Branch staff assisting the President in the exercise of his authorities relating to the enactment of legislation, disclosure of these communications would inevitably reflect the substance and nature of presidential decision-making and deliberations.  Disclosure would also impair presidential decision-making and deliberations by inhibiting the President's advisers and agents in the Executive Branch as they gather information from knowledgeable sources that is potentially relevant to the development of pending legislation.  (Meyer decl. at ¶ 23).  The documents also reveal the pre-decisional, deliberative process of the attorneys involved in them.  (Kovakas decl. at ¶¶ 9-20, 22).

ODNI also withheld a small number of email messages reflecting pre-decisional, deliberative communications between ODNI officials and representatives of telecommunications companies about the FISA amendments.  (Hackett decl. at ¶ 44-45).  OLC similarly withheld a small number of documents reflecting communications between OLC attorneys and counsel for or representatives of telecommunications companies about FISA reform that reveal DOJ's pre-decisional deliberations.  (Colborn decl. at ¶¶ 24, 31).[7]

---

[7] OLC also withheld pre-decisional, deliberative emails discussing Brad Berenson -- one of the alleged lobbyists identified in plaintiff's requests – that make recommendations and express opinions with respect to inquiries made by Mr. Berenson.  (Colborn decl. at ¶ 31).

1   III.   DEFENDANTS PROPERLY WITHHELD PURSUANT TO
2          EXEMPTION 3 INFORMATION THAT IS EXEMPT FROM
           DISCLOSURE BY STATUTE.

3       Exemption 3 permits the withholding of information "specifically exempted from disclosure

4  by statute. . . ." 5 U.S.C. § 552(b)(3). Defendants relied upon the following well-recognized non-

5  disclosure statutes to properly withhold information pursuant to Exemption 3: (1) section

6  102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), 50 U.S.C.

7  § 403-1(i)(1); (2) section 6 of the National Security Agency Act of 1959, Public Law 86-36, 50

8  U.S.C. § 402 note; and (3) 18 U.S.C. 798.

9       The first statute, 50 U.S.C. § 403-1(i)(1), directs the Director of National Intelligence to

10 "protect intelligence sources and methods from unauthorized disclosure."[8] See also Berman, 501

11 F.3d at 1140. It is well-established that this provision qualifies as an Exemption 3 withholding

12 statute. Id. The DNI enjoys "'very broad authority to protect all sources of intelligence information

13 from disclosure.'" Berman, 501 F.3d at 1140 (quoting Sims, 471 U.S. at 168-69). "The term

14 'sources' is to be broadly construed and encompasses not only 'secret agents,' but instead reaches

15 all sources of information the [DNI] relies upon, including publicly available information." Berman,

16 501 F.3d at 1140 (quoting Sims, 471 U.S. at 170-71). The Supreme Court held in Sims, 471 U.S.

17 at 180, that "it is the responsibility of the [DNI], not that of the judiciary, to weigh the variety of

18 complex and subtle factors in determining whether disclosure of information may lead to an

19 unacceptable risk of compromising the Agency's intelligence-gathering process." See also Hunt,

20 981 F.2d at 1120. Such broad discretion is justified because even "superficially innocuous

21 information" might reveal intelligence sources and methods. Sims, 471 U.S. at 178. Thus, the

22 DNI's assertion that a particular disclosure could reveal intelligence sources and methods is entitled

23 to substantial deference. Berman, 501 F.3d at 1140, 1142-43. Furthermore, the National Security

24 Act does not require that a determination that the disclosure of information would be expected to

25 result in damage to national security or to identify or explain the damage to intelligence sources and

26 _____

27      [8] IRTPA, Pub.L.No. 108-458, 118 Stat. 3638, amended the National Security Act and
28 transferred the responsibility to protect intelligence sources and methods from the Director of
   Central Intelligence to the Director of National Intelligence. Thus, the case law prior to passage of
   the IRTPA refers to the CIA but applies equally to the DNI.

1   methods that would result from disclosure, as is required when determining whether information is

2   classified pursuant to Executive Order 12958.

3        ODNI and DOJ withheld information that could reveal whether any particular

4   telecommunications carrier has assisted, or may in the future assist, the government with intelligence

5   activities. (Colborn decl. at ¶¶ 16, 37; Hackett decl. at ¶ 42; Brand decl. at ¶ 27-29; Steele decl. at

6   ¶¶ 18-19).   Disclosure of this material would reveal intelligence sources and methods and is

7   therefore not required under 50 U.S.C. § 403-1(i)(1) and FOIA's Exemption 3.  As the DNI attests

8   in his declaration, this information is highly sensitive and should not be publicly disclosed.

9   (McConnell decl. at ¶¶ 5, 23-27).  Disclosure could deter telecommunications companies from

10  assisting the government in the future because entities typically agree to assist the Intelligence

11  Community only after receiving assurances that their assistance to the Government will not be

12  publicly disclosed.  (McConnell decl. at ¶ 24; see also Steele decl. at ¶¶ 18-19). In addition,

13  disclosure of which entities may have assisted us and which had not provides our adversaries

14  valuable information about our intelligence sources, methods and capabilities.  Foreign adversaries

15  could avoid certain communications methods or target their resources against particular

16  telecommunications companies and attempt to impede them from assisting the government with

17  intelligence activities.  (McConnell decl. at ¶ 25; Hackett decl. at ¶ 42; Steele decl. at ¶¶ 18-19;

18  Brand decl. at ¶¶ 27-29).  The DNI further explains that disclosure of which telecommunications

19  companies have contacted us would allow the public and our adversaries to make inferences about

20  which companies are assisting us and which are not.  The DNI states that "Although it is true that

21  companies that are not assisting the government may have contacted us to discuss liability protection

22  due to the fact that they had been sued for alleged activities, I believe that taken as a whole, the type

23  of information being withheld from plaintiffs could be viewed as confirming which private parties

24  are or are not assisting the government, and that this information must be protected." (McConnell

25  decl. at ¶ 26; see also Hackett decl. at ¶ 42; Steele decl. at ¶¶ 18-19; Brand decl. at ¶¶ 27-29).  The

26  DNI's determination that disclosure of the withheld identities of telecommunications companies

27  could reveal intelligence sources and methods is well founded and entitled to substantial deference.

28  See Berman, 501 F.3d at 1142-43 (upholding CIA declaration where more specific response might

1    allow foreign intelligence agents to determine contours of intelligence operations, sources, and

2    methods).

3         This information was also withheld pursuant to the second statute cited above, section 6 of

4    the National Security Agency Act of 1959, Public Law 86-36, 50 U.S.C. § 402 note, which provides

5    that "[n]othing in this Act or any other law . . .shall be construed to require the disclosure of the

6    organization or any function of the National Security Agency, of any information with respect to the

7    activities thereof,. . ." (See Hackett decl. at ¶ 42; Brand decl. at ¶ 25, 27-29).  Courts have held that

8    the protection provided by this statutory privilege is, by its very terms, absolute.  See, e.g., Linder

9    v. NSA, 94 F.3d 693, 696 (D.C. Cir. 1996).  As with the sources and methods provision of the

10   National Security Act, no showing of specific harm is required when invoking this statutory

11   privilege, and the information need not be classified.  The communications with telecommunication

12   companies at issue in this case would tend to reveal a method by which NSA may collect foreign

13   communications and therefore is protected from disclosure pursuant to section 6 of the National

14   Security Agency Act of 1959 and FOIA's Exemption 3.

15        The third statute, 18 U.S.C. 798, prohibits unauthorized disclosure of classified information

16   (i) concerning the communications intelligence activities of the United States or (ii) obtained by the

17   process of communication intelligence derived   from the communications of any foreign

18   government.  Certain classified information was properly withheld pursuant to this statute.  (See

19   Brand decl. at ¶¶ 19-21, 23, 24, 26; Hackett decl. at ¶¶ 29, 34-35).[9]

20        IV.    DEFENDANTS PROPERLY WITHHELD CLASSIFIED MATERIALS
                UNDER EXEMPTION 1.

21

22        FOIA Exemption 1 protects records that are:  "(A) specifically authorized under criteria

23   established by an Executive Order to be kept secret in the interest of national defense or foreign

24   policy, and (B) are in fact properly classified pursuant to Executive Order."  5 U.S.C. § 552 (b)(1);

25   accord, e.g., Weinberger v. Catholic Action of Hawaii, 454 U.S. 139, 144 (1981).  In other words,

26

27        [9] ODNI also withheld pursuant to these three non-disclosure statutes correspondence with
     Members of Congress and their classified attachments (Hackett decl. at ¶¶ 27-29); emails between
28   ODNI, DOJ, White House officials and Congressional staff and their attachments (id. at ¶ 34); and
     classified briefing slides (id. at ¶ 35).  (See also Brand decl. at ¶¶ 18-24).

under Exemption 1 material that has been properly classified is exempt from disclosure. Weinberger, 454 U.S. at 144-45. For information to be properly classified pursuant to Exemption 1, the information must meet the requirements of Executive Order ("E.O.") 12,958, "Classified National Security Information," as amended by E.O. 13,292. 68 Fed. Reg. 15315 (Mar. 28, 2003):

> (1)   an original classification authority is classifying the information;
>
> (2)   the information is owned by, produced by or for, or is under the control of the United States Government;
>
> (3)   the information falls within one or more of the categories of information in § 1.4 of E.O 12958, as amended; and
>
> (4)   the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security and the original classification authority is able to identify or describe the damages.

Id. § 1.1, 68 Fed. Reg. at 15315. The Executive Order lists three classification levels for national security information: top secret, secret, and confidential. Id. § 1.2, 68 Fed. Reg. at 15315-16.

In reviewing classification determinations under Exemption 1, the courts have repeatedly stressed that, like the Exemption 3 analysis, "substantial weight" must be accorded agency affidavits concerning classified status of the records at issue, and that summary judgment is appropriate if the agency submits a detailed affidavit showing that the information logically falls within the exemption. See Minier, 88 F.3d at 800; see also Halperin v. CIA, 629 F.2d 144, 147-49 (D.C. Cir. 1980) ("summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of bad faith"). Moreover, if "the agency's statements meet this standard the court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency." Halperin, 629 F.2d at 148; see also Frugone v. CIA, 169 F.3d 772, 775 (D.C. Cir. 1999) ("Mindful that courts have little expertise in either international diplomacy or counterintelligence operations, we are in no position to dismiss the CIA's facially reasonable concerns."); Salisbury v. United States, 690 F.2d 966, 970 (D.C. Cir. 1982) ("'The Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of public disclosure of a

1  particular classified record.'") (quoting S. Rep. No. 1200, 93rd Cong., 2d Sess. 12 [1974]).

2      The declarations submitted herewith fully support application of Exemption 1, as they

3  describe "the justifications for nondisclosure with reasonably specific detail," and demonstrate "that

4  the information withheld logically falls within the claimed exemption[]." Minier, 88 F.3d at 800.

5  (See Declaration of Matthew G. Olsen at ¶¶ 4-11; Hardy decl. at ¶¶ 9-23; Steele decl. at ¶ 15;

6  Hackett decl. at ¶¶ 27-28, 32-33, 35-37, 39; Brand decl. at ¶¶ 17-21, 23-24, 26). ODNI, for example,

7  withheld secret and top secret classified information, contained in correspondence with Members

8  of Congress and classified attachments, pertaining to how NSA collects communications, including

9  the types of communications collected and the transmission path of these communications.

10  Disclosure of this information would allow our adversaries to accumulate information and draw

11  conclusions about the Intelligence Community's technical capabilities and sensitive sources and

12  methods. (Hackett decl. at ¶¶ 27-28). ODNI also withheld emails between ODNI, DOJ, White

13  House officials and congressional staff, and their attachments, that were sent through a classified

14  email system and include specific details about how information is collected by the Intelligence

15  Community. These records include precise responses to certain potential intelligence scenarios

16  provided by Congress. Disclosure of this information would provide our adversaries with sensitive

17  information about the Intelligence Community's collection capabilities and the technical means by

18  which this collection is performed. (Id. at ¶¶ 30, 33). For similar reasons, ODNI withheld classified

19  briefing slides, emails and internal memoranda created by ODNI staff after meetings or briefings

20  with Congress. (Id. at ¶¶ 35-37, 39). (See also Brand decl. at ¶¶ 17-21, 23-24).

21      V.    THE FBI PROPERLY WITHHELD INFORMATION PURSUANT
            TO EXEMPTIONS 2 AND 7(E).

22      DOJ referred 15 pages of responsive documents containing FBI-originated information to

23  the FBI for direct response to plaintiff. The documents consist of two versions of a statement made

24  on September 6, 2007, by FBI Director Robert S. Mueller III before the U.S. House of

25  Representatives Permanent Select Committee on Intelligence regarding FISA. (Hardy decl. at ¶ 5).

26  The FBI properly redacted one word from one page of each version of the statement, pursuant to

27  Exemptions 2 and 7(E). (Id. at ¶¶ 28, 31; Ex. B to Hardy decl. at EFF-5, EFF-12).

28      Exemption 2 exempts internal agency information, the release of which would risk

1  circumvention of agency regulations or statutes ("high 2"). See, e.g., Dirksen v. U.S. Dep't. of

2  Health and Human Services, 803 F.2d 1456, 1458 (9th Cir. 1986). The Ninth Circuit held in Hardy

3  v. ATF, 631 F.2d 653, 656 (9th Cir. 1980), that "[m]aterials instructing law enforcement agents on

4  how to investigate violations concern internal personnel practices" are within the meaning of this

5  exemption. Consequently, "law enforcement materials, disclosure of which may risk circumvention

6  of agency regulation, are exempt from disclosure" under Exemption 2. Id. at 657; accord Dirksen,

7  803 F.2d at 1457 (Exemption 2 authorizes HHS to withhold Medicare claims processing manual that

8  could be used by health care providers to avoid audits); compare Maricopa Audubon Society, 108

9  F.3d at 1087 (map of goshawk nest sites not within Exemption 2 because "[t]he requested

10 information does not tell the Forest Service how to catch lawbreakers; nor does it tell lawbreakers

11 how to avoid the Forest Service's enforcement efforts").

12      Exemption 7 protects from disclosure "information compiled for law enforcement purposes"

13 where release of the information "(E) would disclose techniques and procedures for law enforcement

14 investigations or prosecutions, or would disclose guidelines for law enforcement investigations or

15 prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5

16 U.S.C. § 552(b)(7). Exemption 7 protects a broad array of information used for law enforcement

17 purposes, not merely information related to a specific investigation. "[A]n agency with a clear law

18 enforcement mandate such as the FBI need establish only a 'rational nexus' between its law

19 enforcement duties and the document for which Exemption 7 is claimed." Binion v. DOJ, 695 F.2d

20 1189, 1194 (9th Cir. 1983).

21      The FBI redacted pursuant to Exemptions 2 and 7(E) the number of attorneys at DOJ's

22 Office of Intelligence Policy and Review who work almost exclusively on preparing FISA packages.

23 Release of this information would reveal the extent of the government's efforts in this area and, as

24 such, would reveal specific details of how the FBI conducts its counterterrorism and

25 counterintelligence investigations, as well as sensitive intelligence gathering and reporting of those

26 efforts. Release of this information would expose the FBI to the possibility that savvy individuals

27 could learn about the FBI's techniques it uses in its counterterrorism and counterintelligence

28 investigations and take countermeasures to circumvent the effectiveness of those techniques. (Hardy

1   decl. at ¶¶ 24, 26, 28, 31; Ex. B to Hardy decl. at EFF-5, EFF-12).  The materials were properly

2   withheld pursuant to Exemptions 2 and 7(E).

**<u>CONCLUSION</u>**

For all of the foregoing reasons, ODNI and DOJ did not improperly withhold records under the FOIA and are entitled to summary judgment on all of plaintiff's claims.


Dated: December 10, 2008                    Respectfully submitted,

                                            GREGORY G. KATSAS
                                            Assistant Attorney General

                                            JOHN R. TYLER
                                            Assistant Director, Federal Programs Branch

                                            */s/ Marcia Berman*
                                            MARCIA BERMAN (PA Bar No. 66168)
                                            Trial Attorney, U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Ave., N.W., Room 7132
                                            Washington, D.C. 20530
                                            Telephone: (202) 514-2205
                                            Facsimile: (202) 616-8470
                                            E-mail: marcia.berman@usdoj.gov

                                            *Attorneys for Defendants*

1

2

## <u>SIGNATURE ATTESTATION</u>

3

4     I hereby attest that I have on file all holograph signatures for any signatures indicated by a

5 "conformed" signature (/S/) within this efiled document or within any of the declarations and

6 attachments thereto submitted with this efiled document.

7

8

9

10                                            */s/ Marcia Berman*_____
                                            MARCIA BERMAN
11 -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28