Marcia Hofmann (SBN 250087)
*marcia@eff.org*
Kurt Opsahl (SBN 191303)
*kurt@eff.org*
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333 x116
Facsimile: (415) 436-9993

David L. Sobel *(pro hac vice)*
*sobel@eff.org*
ELECTRONIC FRONTIER FOUNDATION
1875 Connecticut Avenue NW
Suite 650
Washington, DC  20009
Telephone: (202) 797-9009 x104
Facsimile: (202) 707-9066

Attorneys for Plaintiff
ELECTRONIC FRONTIER FOUNDATION

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ELECTRONIC FRONTIER FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE and DEPARTMENT OF JUSTICE,<br><br>Defendants. | NOS. 08-1023 JSW & 08-2997 JSW<br><br>**OPPOSITION TO DEFENDANTS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT**<br><br>**AND**<br><br>**NOTICE OF CROSS MOTION AND CROSS MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          March 13, 2009<br>Time:         9:00 a.m.<br>Courtroom: 2, 17th Floor |

-i -

OPP. TO DEFS.' CONSOL. MOT. SUMM. J.; NOT. OF CROSS MOT. AND
CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................iii

NOTICE OF MOTION.....................................................................................................vii

SUMMARY OF ARGUMENT..........................................................................................viii

MEMORANDUM OF POINTS AND AUTHORITIES ................................................1

I.      INTRODUCTION ..................................................................................................1

II.     STATEMENT OF FACTS .....................................................................................1

        A.    THE ADMINISTRATION'S CAMPAIGN TO SHIELD TELECOMMUNICATIONS CARRIERS FROM
              LIABILITY FOR THEIR ROLE IN UNLAWFUL SURVEILLANCE ACTIVITY .......................................1

        B.    EFF'S FREEDOM OF INFORMATION ACT REQUESTS FOR RECORDS ABOUT THE TELECOM
              LOBBYING CAMPAIGN AND REQUESTS FOR EXPEDITED PROCESSING ......................................6

III.    ARGUMENT.........................................................................................................9

        A.    THE FREEDOM OF INFORMATION ACT AND THE STANDARD OF REVIEW ..........................9

        B.    EFF IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE GOVERNMENT HAS IMPROPERLY
              WITHHELD AGENCY RECORDS ..........................................................................................10

              1.    The Defendants Have Failed to Meet the Procedural Requirements Necessary to
                    Sustain Their Burden Under the FOIA ..................................................................10

              2.    The Defendants Have Improperly Withheld Agency Records Under Exemption
                    5 ...............................................................................................................................11

              3.    The Defendants Improperly Withheld Records Under Exemption 6 ......................30

              4.    The Government Has Failed to Segregate Exempt Materials From Non-Exempt
                    Material as the FOIA Requires..............................................................................33

IV.     CONCLUSION......................................................................................................34

# TABLE OF AUTHORITIES

## CASES

*Alliance for the Wild Rockies v. Dep't of the Interior*, 53 F. Supp. 2d 32 (D.D.C. 1999)............... 32

*Assembly of the State of Cal. v. Assembly Comm. on Elections*, 968 F.2d 916 (9th Cir. 1992)....... 21

*Bank Brussels Lambert v. Credit Lyonnais*, 160 F.R.D. 437 (S.D.N.Y. 1995).............................. 27

*Bd. of Trade v. Commodity Futures Trading Comm'n*, 627 F.2d 392 (D.C. Cir. 1980) ................ 32

*Berger v. Seyfarth Shaw LLP*, 07-05279 JSW, 2008 U.S. Dist. LEXIS 88811, 2008 WL 4681834 (N.D. Cal. Oct. 22, 2008)........................................................................................................ 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)............................................................................. 9

*Center for Biological Diversity v. Office of Management and Budget*, No. 07-4997 MHP, 2008 U.S. Dist. LEXIS 98387, 2008 WL 5129417 (N.D. Cal. Dec. 4, 2008)................................... 18

*Church of Scientology v. Dep't of Army*, 611 F.2d 738 (9th Cir. 1980)........................... viii, 10, 33

*Citizens for Responsibility and Ethics in Government v. Dep't of Homeland Security*, 527 F. Supp. 2d 76 (D.D.C. 2007) ......................................................................................................... 16

*Citizens for Responsibility and Ethics in Washington v. Dep't of Homeland Security*, No. 06-1912 (D.D.C. Jan. 9, 2009) .................................................................................................. 18, 20

*Clark v. United States*, 289 U.S. 1 (1933).................................................................................. 28

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) ....................... 21, 22

*Cohen v. EPA*, 575 F. Supp. 425 (D.D.C. 1983) ....................................................................... 31

*Common Cause v. Nat'l Archives & Records Serv.*, 628 F.2d 179 (D.C. Cir. 1980)..................... 32

*Dep't of Air Force v. Rose*, 425 U.S. 352 (1976).................................................................... 9, 32

*Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989) ..........9, 10, 12

*Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989) ................................................................ 9

*Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001)............11, 13, 15

*Dow Jones & Co. v. Dep't of Justice,* 908 F.2d 1006 (D.C. Cir. 1990) .......................viii, 12, 13, 15

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Counsel*, 485 U.S. 568 (1988)................................................................................................................................. 15

*Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285 (9th Cir. 1987) .................................................. 9

-iii-

OPP. TO DEFS.' CONSOL. MOT. SUMM. J.; NOT. OF CROSS MOT. AND
CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

*Elec. Frontier Foundation v. Office of the Director of Nat. Intelligence,* No. 08-1023 JSW, 542 F. Supp. 2d 1181, 1186 (N.D. Cal. 2008) .............................................................................. 4, 6, 8

*Elec. Privacy Info. Ctr. v. Dep't of Justice*, 511 F. Supp. 2d 56 (D.D.C. 2007) ............................ 23

*Fed. Trade Comm'n v. Grolier, Inc.*, 462 U.S. 19 (1983) ............................................................. 24

*Goland v. CIA*, 607 F.2d 339 (D.C. Cir. 1979) ........................................................................... 14

*Harper-Wyman Co. v. Connecticut General Life Ins. Co.*, No. 86 C 9595, 1991 U.S. Dist. LEXIS 5007, 1991 WL 62510 (N.D. Ill. Apr. 17, 1991)........................................................................ 24

*Holy Spirit Ass'n for the Unification of World Christianity v. CIA*, 636 F.2d 838 (D.C. Cir. 1980)14

*Hunton & Williams, LLP v. Dep't of Justice,* No. 06-477, 2008 U.S. Dist. LEXIS 26015, 2008 WL 906783 (E.D. Va. March 31, 2008) ............................................................................................ 28

*In re Grand Jury Subpoenas dated March 9, 2001*, 179 F. Supp. 2d 270 (S.D.N.Y. 2001)........... viii

*In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078 (9th Cir. 2007) ....................................... 28, 29

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997) ................................................................passim

*In re Sealed Case*, 676 F.2d 793 (D.C. Cir. 1982) ................................................................. 16, 30

*Int'l Bd. of Elec. Workers v. Dep't of Hous. & Urban Dev.*, 763 F.2d 435 (D.C. Cir. 1985).......... 32

*John Doe, Inc. v. Mukasey*, __ F.3d __, No. 07-4943, 2008 U.S. App. LEXIS 25193, 2008 WL 5205951 (2nd Cir. Dec. 15, 2008) ............................................................................................ 26

*Jordan v. Dep't of Justice*, 591 F.2d 753 (D.C. Cir. 1978)........................................................... 21

*Judicial Watch, Inc. v. Dep't of Energy*, 310 F. Supp. 2d 271 (D.D.C. 2004)................................ 23

*Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108 (D.C. Cir. 2004)..............................passim

*Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252 (D.D.C. 2004) ............................ 23

*Kamman v. IRS*, 56 F.3d 46 (9th Cir. 1995)................................................................................ 10

*King v. Dep't of Justice*, 830 F.2d 210 (D.C. Cir. 1987) ............................................................. 11

*Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136 (1980)............................ 12

*Laroche v. SEC*, No. 05-4760 CW, 2006 U.S. Dist. LEXIS 75415, 2006 WL 2868972 (N.D. Cal. Oct. 6, 2006)............................................................................................................................. 9

*Lawyers' Comm. For Civil Rights of San Francisco Bay Area v. Dep't of the Treasury*, No. 07-2590 PJH, 2008 U.S. Dist. LEXIS 87624, 2008 WL 448285 (N.D. Cal. Sept. 30, 2008).......... 34

*Maricopa Audubon Soc'y v. U.S. Forest Service*, 108 F.3d 1089 (9th Cir. 1997) ........................ 21

*Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242 (D.C. Cir. 1977) ...............10, 33, 34

*Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007).......................................................................... 11

1    *N.Y. Times Co. v. Dep't of Defense*, 499 F. Supp. 2d 501 (S.D.N.Y. 2007) .................................. 23

2    *Nat'l Institute of Military Justice v. Dep't of Defense*, 512 F.3d 677 (D.C. Cir. 2008) ................. 13

3    *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978)............................. 9

4    *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) ............................. 11, 21

5    *Nat'l Wildlife Fed'n v. U.S. Forest Service*, 861 F.2d 1114 (9th Cir. 1988) .............................. 9, 21

6    *NDRC v. Dep't of Defense*, 388 F. Supp. 2d 1086 (C.D. Cal. 2005)................................................ 33

7    *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) ........................... 25, 27

8    *North Carolina Elec. Membership Corp. v. Carolina Power & Light Co.,* 110 F.R.D. 511, (M.D.N.C. 1986)......................................................................................................................... 24

9    *Oak Industries v. Zenith Industries*, No. 86 C 4302, 1988 U.S. Dist. LEXIS 7985, 1988 WL 79614 (N.D. Ill. July 27, 1988)............................................................................................................. 27

10

11    *P. & B. Marina v. Logrande*, 136 F.R.D. 50 (E.D.N.Y. 1991) ............................................... 29

12    *Paisley v. CIA*, 712 F.2d 686 (D.C. Cir. 1983),.................................................................. 14

13    *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429 (D.C. Cir. 1992)................................ 23

14    *Rockwell Int'l Corp. v. Dep't of Justice*, 235 F.3d 598 (D.C. Cir. 2001) ....................................... 13

15    *Ryan v. Dep't of Justice*, 617 F.2d 781 (D.C. Cir. 1980)........................................................... 13, 20

16    *Sims v. CIA*, 642 F.2d 562 (D.C. Cir. 1980).............................................................................. viii

17    *Strang v. Collyer*, 710 F. Supp. 9 (D.D.C. 1989) ..................................................................... 21

18    *U.S. Postal Serv. v. Phelps Dodge Refining Corp.*, 852 F. Supp. 156 (E.D.N.Y. 1994)................. 24

19    *United States v. Bergonzi*, 216 F.R.D. 487 (N.D. Cal. 2003) .................................................. 24, 25

20    *United States v. Edison*, Nos. CR 07-0074 WHA & CR 07-0479 WHA, 2008 U.S. Dist. LEXIS 6825, 2008 WL 170660 (N.D. Cal. Jan. 17, 2008)................................................................. 29

21

22    *United States v. Massachusetts Institute of Technology*, 129 F.3d 681 (1st Cir. 1997) ..... viii, 25, 26

23    *United States v. Nixon*, 418 U.S. 683 (1974) ............................................................................. 16

24    *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001) .................................... 15

25    *United States v. Rozet*, 183 F.R.D. 662 (N.D. Cal. 1998)...................................................... 21, 22

26    *United States v. Zolin*, 491 U.S. 554 (1989) ............................................................................. 29

27    *United We Stand America, Inc. v. IRS*, 359 F.3d 595 (D.C. Cir. 2004)........................................ 14

28    *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)......................................................................... 10

–v–

Opp. to Defs.' Consol. Mot. Summ. J.; Not. of Cross Mot. and
Cross Mot. Summ. J.; Mem. in Supp. of Cross Mot. Summ. J.

*Wash. Post Co. v. Dep't of Agric.*, 943 F. Supp. 31 (D.D.C. 1996) ................................................. 31

*Wash. Post Co. v. Dep't of Health & Human Servs.*, 690 F.2d 252 (D.C. Cir. 1982).................... 32

*Wiener v. FBI*, 943 F.2d 972 (9th Cir. 1991) .................................................................... viii, 11, 33

## CONSTITUTIONAL AND LEGISLATIVE AUTHORITIES

28 C.F.R. § 16.5(d)(1)(ii) ............................................................................................................. 7

32 C.F.R. § 1700.12(c)(2) ............................................................................................................. 7

2 U.S.C. § 1601 ............................................................................................................................ 31

5 U.S.C. § 552 ............................................................................................................................... 1

5 U.S.C. § 552 (a)(6)(E)(v)(II) ..................................................................................................... 7

5 U.S.C. § 552(a)(4)(B) .............................................................................................................. 10

5 U.S.C. § 552(b)..................................................................................................................... 9, 33

5 U.S.C. § 552(b)(5) ................................................................................................................... 11

5 U.S.C. § 552(b)(6) ................................................................................................................... 31

5 U.S.C. § 552(f)......................................................................................................................... 12

Foreign Intelligence Surveillance Act of 1978 Amendments Act of 2008, ("FISAAA"), 50 U.S.C. § 1885, Pub. L. No. 110-261 (2008)...............................................................................6, 26, 27

Pub. L. No. 110-81...................................................................................................................... 31

Pub. L. No. 110-175, § 4, 121 Stat. 2524 (2007) ....................................................................... 12

Pub. L. No. 110-55....................................................................................................................... 3

U.S. Const. art. I, § 7 .................................................................................................................. 19

Fed. R. Civ. P. 56(c) .................................................................................................................... 9

Fed. R. Civ. P. 56(e) ................................................................................................................... 31

**NOTICE OF MOTION**

TO DEFENDANTS AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on March 13, 2009, or as soon thereafter as the matter may be heard in Courtroom 2 on the 17th Floor of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California, plaintiff Electronic Frontier Foundation ("EFF") will, and hereby does, cross move for summary judgment.

Pursuant to Federal Rule of Civil Procedure 56, EFF seeks a court order requiring the Office of the Director of National Intelligence ("ODNI") and Department of Justice ("DOJ") to release records under the Freedom of Information Act ("FOIA"). EFF respectfully asks that this Court issue an order requiring the government to release all records improperly withheld from the public. This cross motion is based on this notice of cross motion, the memorandum of points and authorities in support of this cross motion, the declaration of Marcia Hofmann and attached exhibits in support of this cross motion, and all papers and records on file with the Clerk or which may be submitted prior to or at the time of the hearing, and any further evidence which may be offered.

## SUMMARY OF ARGUMENT

The defendants are not entitled to summary judgment because they have failed to meet their burden of showing that all withheld records fall within one of the nine narrow exemptions to the Freedom of Information Act ("FOIA"). 5 U.S.C. § 552(a)(4)(B). As an initial matter, the defendants have not provided enough detail about their withholdings to satisfy the procedural requirements necessary to withhold records. *Wiener v. FBI*, 943 F.2d 972, 977 (9th Cir. 1991). In addition, the defendants have improperly asserted 5 U.S.C. § 552(b)(5), which protects inter-agency or intra-agency records that would normally be privileged in civil discovery, to withhold communications that have been shared with entities outside the Executive branch that are not "agencies" under the plain language of the FOIA. *Dow Jones & Co. v. Dep't of Justice,* 908 F.2d 1006, 1009 (D.C. Cir. 1990). The defendants have also made broad assertions of the presidential communications privilege that have no basis in law. *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1115-16 (D.C. Cir. 2004). Furthermore, the defendants have claimed the deliberative process privilege to withhold material that is not predecisional and deliberative. *Assembly of the State of Cal. v. Assembly Comm. on Elections*, 968 F.2d 916, 920 (9th Cir. 1992). The defendants have also asserted the attorney work product and common interest privileges to withhold lobbying information that may not have been developed in anticipation of litigation and may not relate to a legal interest shared with telecommunications companies. *In re Grand Jury Subpoenas dated March 9, 2001*, 179 F. Supp. 2d 270, 285 n.6 (S.D.N.Y. 2001); *United States v. Massachusetts Institute of Technology* ("*MIT*"), 129 F.3d 681 (1st Cir. 1997).

Moreover, the defendants have withheld agency records under 5 U.S.C. § 552(b)(6) to shield names of individuals lobbying on behalf of telecommunications carriers, improperly asserting a privacy interest in business activities. *Sims v. CIA*, 642 F.2d 562, 575 (D.C. Cir. 1980). The significant public interest in disclosure outweighs the privacy interest the lobbyists might have in their names. Finally, the defendants have failed to show that all non-exempt information has been segregated from exempt material and released to the plaintiff. *Church of Scientology v. Dep't of Army*, 611 F.2d 738, 742 (9th Cir. 1980).

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking the disclosure of records held by defendants ODNI and DOJ concerning the efforts of the agencies and telecommunications carriers to push for changes in U.S. foreign intelligence surveillance law, especially to ensure that such companies receive legal immunity for their role in the government's unlawful surveillance of millions of Americans. The defendants have moved for summary judgment, asking the Court to sustain their decision to withhold a substantial portion of the requested material in part or whole. Because the agencies have failed to meet their burden—both procedurally and substantively—the Court should deny the government's consolidated motion for summary judgment and grant EFF's cross-motion for summary judgment. EFF respectfully requests entry of an order compelling the defendants immediately to disclose all improperly withheld records.

## II. STATEMENT OF FACTS

### A. The Administration's Campaign to Shield Telecommunications Carriers From Liability for Their Role in Unlawful Surveillance Activity

The agency activities at the heart of this case concern ODNI and DOJ's lobbying efforts to ensure telecommunications providers are not held responsible for their participation in a massive, well-documented surveillance program through which the United States government has unlawfully gathered information about millions of Americans. Attached as Exhibit 1 to the Declaration of Marcia Hofmann ("Hofmann Decl.") is the Plaintiffs' Federal Rule of Evidence Section 1006 Summary of Voluminous Evidence recently filed in *In re National Security Agency Telecomm's Records Litig.* ("*In re NSA* MDL") (Case No. 06-1791-VRW) (MDL Dkt. 481),[1] which describes the warrantless surveillance program in detail. *See* Hofmann Decl. Ex. 1 at 6-49.

The first news of this surveillance program reached the public on December 15, 2005, when the *New York Times* reported:

---

[1] Plaintiff EFF is Co-Lead Coordinating Counsel in the *In Re NSA* MDL litigation.

> Months after the Sept. 11 attacks, President Bush secretly authorized the National Security Agency to eavesdrop on Americans and others inside the United States to search for evidence of terrorist activity without the court-approved warrants ordinarily required for domestic spying, according to government officials.
>
> Under a presidential order signed in 2002, the intelligence agency has monitored the international telephone calls and international e-mail messages of hundreds, perhaps thousands, of people inside the United States without warrants over the past three years ….

James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. TIMES, Dec. 16, 2005 (Hofmann Decl. Ex. 2); First Am. Compl. ¶ 8 (3:08-cv-02997-JSW Dkt. 9) (hereafter "08-2997 Am. Compl."); Answer ¶ 8 (3:08-cv-02997-JSW Dkt. 11) (hereafter "08-2997 Answer"). The following day, President Bush confirmed in a radio address that he had authorized a surveillance program to intercept international communications in which one participant was suspected of having a connection to the terrorist organization al-Qaeda. President's Radio Address (Dec. 17, 2005), (Hofmann Decl. Ex. 3); 08-2997 Am. Compl. ¶ 8; 08-2997 Answer ¶ 8. Shortly thereafter, the *New York Times* reported that the NSA's surveillance activity was far more extensive than President Bush had admitted. According to the *Times*:

> The National Security Agency has traced and analyzed large volumes of telephone and Internet communications flowing into and out of the United States as part of the eavesdropping program that President Bush approved after the Sept. 11, 2001, attacks to hunt for evidence of terrorist activity, according to current and former government officials.

Eric Lichtblau, *Spy Agency Mined Vast Data Trove, Officials Report*, N.Y. TIMES, Dec. 24, 2005 (Hofmann Decl. Ex. 4); 08-2997 Am. Compl. ¶ 9; 08-2997 Answer ¶ 9. The press continued to reveal the broad scope of the government's surveillance operation. On February 6, 2006, for instance, *USA Today* reported, "[t]he National Security Agency has secured the cooperation of large telecommunications companies, including AT&T, MCI and Sprint, in its efforts to eavesdrop without warrants on international calls by suspected terrorists, according to seven telecommunications executives." Leslie Cauley and John Diamond, *Telecoms Let NSA Spy on Calls*, USA TODAY, Feb. 6, 2006 (Hofmann Decl. Ex. 5); 08-2997 Am. Compl. ¶ 10; 08-2997 Answer ¶ 10.

Since the NSA's massive and illegal warrantless surveillance program was first revealed, over 40 lawsuits have been filed throughout the United States seeking to hold the government and

-2-

cooperating telecommunications carriers responsible for violating the law and the privacy of countless citizens and customers. In addition, the United States filed several suits against state public utility commissioners and attorneys general and various telecommunications carriers seeking to block the states' attempts to seek information from the carriers about their involvement in warrantless surveillance activities. All of these lawsuits have been consolidated and are currently pending in the United States District Court for the Northern District of California. *See generally In re NSA* MDL (No. 06-1791 VRW).

On August 5, 2007, President Bush signed into law the Protect America Act of 2007, which expanded the government's authority to intercept communications of Americans without warrants through the Foreign Intelligence Surveillance Act ("FISA"). Pub. L. No. 110-55, 121 Stat. 552. Among other things, the law contained provisions designed to protect telecommunications companies from *future* legal liability for their role in certain government surveillance activity.

In an article published the same day the Protect America Act became law, the *New York Times* reported:

> [The Protect America Act] gave the administration greater power to force telecommunications companies to cooperate with such spying operations. . . .
>
> In fact, pressure from the telecommunications companies on the Bush administration has apparently played a major hidden role in the political battle over the surveillance issue over the past few months.

James Risen, *Bush Signs Law to Widen Reach for Wiretapping*, N.Y. Times, Aug. 5, 2007, (Hofmann Decl. Ex. 6); 08-2997 Am. Compl. ¶ 13; 08-2997 Answer ¶ 13. The Protect America Act included a provision stating that the law would expire in February 2008 without further congressional action. President Bush indicated that the Administration would push for more extensive, and likely retroactive, legal immunity for telecommunications companies:

> When Congress returns in September the Intelligence committees and leaders in both parties will need to complete work on the comprehensive reforms requested by Director [of National Intelligence Mike] McConnell, including the important issue of providing meaningful liability protection to those who are alleged to have assisted our Nation following the attacks of September 11, 2001.

White House Office of the Press Secretary, *President Bush Commends Congress on Passage of Intelligence Legislation* (Aug. 6, 2007) (Hofmann Decl. Ex. 7); 08-2997 Am. Compl. ¶ 14; 08-

2997 Answer ¶ 14. In an August 22, 2007 interview discussing the government's warrantless

surveillance activities, Director McConnell stated:

> [U]nder the president's program, the terrorist surveillance program, the private sector had assisted us. Because if you're going to get access you've got to have a partner and they were being sued. Now if you play out the suits at the value they're claimed, it would bankrupt these companies. So my position was that we have to provide liability protection to these private sector entities.

Chris Roberts, *Transcript: Debate on the Foreign Intelligence Surveillance Act*, EL PASO TIMES,

Aug. 22, 2007 (Hofmann Decl. Ex. 8); 08-2997 Am. Compl. ¶ 15; 08-2997 Answer ¶ 15.

Furthermore, according to an article published by *Newsweek*, "[t]he nation's biggest

telecommunications companies, working closely with the White House, have mounted a secretive

lobbying campaign to get Congress to quickly approve a measure wiping out all private lawsuits

against them for assisting the U.S. intelligence community's warrantless surveillance programs."

Michael Isikoff and Mark Hosenball, *Case Dismissed?: The Secret Lobbying Campaign Your

Phone Company Doesn't Want You to Know About*, NEWSWEEK, updated Sept. 26, 2007 (Hofmann

Decl. Ex. 9); 08-2997 Am. Compl. ¶ 17; 08-2997 Answer ¶ 17.

Congress allowed the Protect America Act to expire on February 16, 2008 without reaching

an agreement to extend the controversial law. *See Elec. Frontier Foundation v. ODNI,* No. 08-1023

JSW, 542 F. Supp. 2d 1181, 1186 (N.D. Cal. 2008). During February 2008, DOJ and ODNI made

repeated public references to communications and other exchanges with representatives of

telecommunications companies, asserting that the telecommunications companies might refuse to

cooperate with even lawful government's surveillance requests unless the companies received

immunity in the pending FISA legislation. *See* 08-2997 Am. Compl. ¶¶ 21-30. For example, in a

February 15, 2008 interview with Jim Angle on Fox News, ODNI Director McConnell said, "The

companies are telling us if you can't protect us, the cooperation you need is not going to be there."

08-2997 Am. Compl. ¶ 23; *Interview of Mr. Mike McConnell, Director of National Intelligence,

with Jim Angle, Fox News*, Feb. 15, 2008 (Hofmann Decl. Ex. 10). Moreover, a February 23, 2008,

press release jointly issued by DOJ and ODNI said, "In addition, although our private partners are

cooperating for the time being, they have expressed understandable misgivings about doing so in

light of the on-going uncertainty and have indicated that they may well discontinue cooperation if

-4-

the uncertainty persists." Press Release, Dep't of Justice and Office of the Director of National Intelligence, *Statement by the Department of Justice and the Office of the Director of National Intelligence Regarding Cooperation With Private Partners* (Feb. 23, 2008) (Hofmann Decl. Ex. 11); 08-2997 Am. Compl. ¶ 26. Similarly, on February 26, 2008, a "Senior Administration Official" said in a press conference:

> … I, and colleagues of ours, both in ODNI and DOJ, have been working very closely with general counsels offices in the various providers, because they've been asking about this looming potential expiration [of the Protect America Act] for some time and what its implications will be.

White House Office of the Secretary, *Transcript of Background Briefing on FISA by Senior Administration Officials* (Feb. 26, 2008) (Hofmann Decl. Ex. 12). The Senior Administration Official went on to say:

> Most providers were complying, but as of the time that we sent the letter, not all. And then soon after that—we've been in intense discussion, back and forth, with a number of different parties, we achieved full compliance—just with that, with the compliance with our request to go up on new surveillances under those PAA directives. However, they've made it very clear that this isn't a permanent situation, and they're concerned about it and they might—they may well withdraw that cooperation if the situation doesn't get cleared up with permanent legislation.

*Id*. Nevertheless, the supporters of the FISA bill continued to cite the purported telecommunications companies threats to stop "cooperation" with lawful surveillance orders as critical for their arguments to make the telecommunications companies unaccountable. *See, e.g.,* Press Release, Office of the Director of National Intelligence, *Statement by the Department of Justice and the Office of the Director of National Intelligence Regarding House FISA Proposal* (March 11, 2008) (Hofmann Decl. Ex. 13) ("Exposing the private sector to continued litigation for assisting in efforts to defend the country understandably makes the private sector much more reluctant to cooperate. Without their cooperation, our efforts to protect the country cannot succeed."); Letter from Attorney General Mukasey and Director of National Intelligence McConnell to Senator Harry Reid (June 26, 2008) (Hofmann Decl. Ex. 14) (arguing for telecom immunity based upon the possibility "that companies in the future may be less willing to assist the government."); Press Release, White House Office of the Press Secretary, *Fact Sheet: Senate Must Act Quickly on Bipartisan Foreign Intelligence Legislation to Ensure That Out Intelligence*

1   *Professionals Can Better Protect America From Terrorists* (July 3, 2008) (Hofmann Decl. Ex. 15)

2   (The final FISA legislation "Does Not: Undermine private-sector telecommunications companies'

3   willingness to provide essential help to our Intelligence Community.").

4          After nearly a year of heated public and legislative debate, the Foreign Intelligence

5   Surveillance Act of 1978 Amendments Act of 2008 ("FISAAA"), codified at 50 U.S.C. § 1885 *et*

6   *seq.*, was enacted by Congress on July 9, 2008 and signed into law the following day. Pub. L. No.

7   110-261, 122 Stat. 2436 (2008). The final version purports to extend retroactive legal immunity to

8   telecommunications companies that had facilitated the government's warrantless surveillance

9   program. *See* 50 U.S.C. § 1885a. The plaintiffs in the *In re NSA* MDL have challenged the

10  constitutionality of FISAAA, and are waiting the decision of Chief Judge Vaughn Walker. *See In*

11  *re NSA* MDL (Dkt. 483).

12      **B.      EFF's Freedom of Information Act Requests For Records About the Telecom
            Lobbying Campaign and Requests for Expedited Processing**

13         On December 21, 2007, EFF faxed two letters to ODNI and DOJ's Offices of the Attorney

14  General, Legislative Affairs, Legal Policy, Legal Counsel, and National Security Division,

15  requesting under FOIA all records from September 1, 2007 to December 21, 2007 concerning

16  "briefing, discussions, or other exchanges" that agency officials

17
            have had with 1) members of the Senate or House of Representatives and 2)
18          representatives or agents of telecommunications companies concerning amendment
            to FISA, including any discussion of immunizing telecommunications companies or
19          holding them otherwise unaccountable for their role in government surveillance
            activities. This request includes, but is not limited to, all email, appointment
20          calendars, telephone message slips, or other records indicating that such briefings,
            discussions, or other exchanges took place.
21
    *Elec. Frontier Foundation,* 542 F. Supp. 2d at 1184; Compl. ¶¶ 18-19 (08-cv-01023-JSW Dkt. 1)

22  (hereafter "08-1023 Compl.").

23         In letters sent by facsimile on April 24, 2008, to the same set of agencies, EFF requested

24  under the FOIA all records:

25      A.  from December 21, 2007 to the present concerning briefings, discussions, or other
            exchanges any [agency] official has had with representatives or agents of
26

27

28

-6-

telecommunications companies[2] concerning amendments to FISA, including any discussion of immunizing telecommunications companies or holding them otherwise unaccountable for their role in government surveillance activities;

B.  from December 21, 2007 to the present concerning briefings, discussions, or other communications from any [agency] official to any member of the Senate or House of Representatives or their staffs[3];

C.  from December 21, 2007 to the present concerning *any* communications, discussions, or other exchanges regardless of subject that any [agency] official has had with Charlie Black, Wayne Berman, Dan Coats, Tom Donilon, Jamie Gorelick or Brad Berenson; and

D.  from January 1, 2007 to the present that are responsive to the categories above, and have not yet been produced in response to previous EFF FOIA requests.

08-2997 Am. Compl. ¶¶ 34-35; 08-2997 Answer ¶¶ 34-35.

        In each of its letters, EFF formally requested that the processing of these requests be expedited because they seek the disclosure of information about which there is "[a]n urgency to inform the public about an actual or alleged [f]ederal [g]overnment activity," and were "made by a person primarily engaged in disseminating information," as provided in 5 U.S.C. § 552 (a)(6)(E)(v)(II), 32 C.F.R. § 1700.12(c)(2), and 28 C.F.R. § 16.5(d)(1)(ii). 08-2997 Am. Compl. ¶ 36; 08-2997 Answer ¶ 36; 08-1023 Compl. ¶ 20.

        When the agencies did not respond in a timely manner to each set of requests, EFF filed suit on February 20, 2008 and June 17, 2008, respectively, seeking the immediate processing and release of all improperly withheld records. 08-1023 Compl.; 08-2997 Am. Compl. Recognizing the extraordinary public interest in the documents requested, the Court ordered the defendants on April

---

[2] The phrase "representatives or agents of telecommunications companies" was defined to "include lobbyists and lawyers acting on behalf of such companies. According to Newsweek, these individuals may include, but are not limited to, 'powerhouse Republican lobbyists Charlie Black and Wayne Berman (who represent AT&T and Verizon, respectively), former GOP senator and U.S. ambassador to Germany Dan Coats (a lawyer at King & Spaulding who is representing Sprint), former Democratic Party strategist and one-time assistant secretary of State Tom Donilon (who represents Verizon), former deputy attorney general Jamie Gorelick (whose law firm also represents Verizon) and Brad Berenson, a former assistant White House counsel under President George W. Bush who now represents AT&T.'"

[3]  EFF did not seek communications *from* members of Congress *to* DOJ officials.

-7-

1    4, 2008 to expedite the processing of all withheld records related to the December 2007 requests.[4]

2    *Elec. Frontier Foundation,* 542 F. Supp. 2d 1181.

3         The defendants have processed each of EFF's requests as described in detail in the

4    defendants' affidavits, withholding a significant amount of material in whole or part. *See*

5    Declaration of Melanie Ann Pustay, DOJ Office of Information and Privacy, ¶¶ 10, 13-16 & 39-42

6    ("Pustay Decl.") (08-2997 Dkt. 33); Declaration of Paul P. Colburn, DOJ Office of Legal Counsel,

7    ¶¶ 5, 7-9 & 12-15 ("Colburn Decl.") (08-2997 Dkt. 32); Declaration of Charles M. Steele, DOJ

8    National Security Division, ¶¶ 9-12 ("Steele Decl.") (08-2997 Dkt. 35); Declaration of James M.

9    Kovakas, DOJ Civil Division, ¶¶ 6-8 ("Kovakas Decl.") (08-2997 Dkt. 337); Second Declaration

10   of David M. Hardy, FBI, ¶¶ 5-6 ("Hardy Decl.") (08-2997 Dkt. 41); Declaration of John F.

11   Hackett, ODNI, ¶¶ 12-13 & 15-20 ("Hackett Decl.") (08-2997 Dkt. 31).

12        Upon reviewing the released documents and the defendants' explanations for their

13   withholdings, EFF has decided not to challenge 1.) the adequacy of the agencies' searches, or 2.)

14   the withholding of any material under Exemptions 1, 2, 3, or 7(E).[5] EFF also does not challenge the

15   withholding of identifying information about any government or private sector individuals with the

16   exception of those associated with telecommunications companies. Thus, as a result of EFF's

17   efforts to narrow the scope of the litigation, the only material still at issue relates to unclassified

18   communications between and among executive agencies, Congress, the White House, and

19   telecommunications companies concerning amendments to FISA, and the identities of individual

20   ───────────────

21   [4] The parties negotiated a processing schedule for the April 2008 requests, thus making it
     unnecessary for EFF to file a second motion for a preliminary injunction to ensure the expedited

22   processing of the records they sought. *See* 08-1023 Dkt. 62.
     [5] This limitation eliminates from the scope of the litigation all records described in the Second

23   Declaration of David Hardy, ODNI *Vaughn* Index Groups 1 & 4 (08-2997 Dkt. 31), OIP *Vaughn*
     Index Groups 11, 12 & 13 (08-2997 Dkt. 33); NSD *Vaughn* Index Part 1, Group 7 (08-2997 Dkt.

24   35), as well as certain records described in ODNI *Vaughn* Index Group 2 and NSD *Vaughn* Index
     Part 1, Group 4. In some cases, the government claims Exemptions 1 and/or 3 in conjunction with

25   Exemptions 5 and/or 6. *See, e.g.*, ODNI *Vaughn* Index Groups 2, 5-6; OIP *Vaughn* Index Groups 1-
     2, 5-6; OLC *Vaughn* Index Groups 1, 5-6, 8, 10-12, 15-16, 21, 24, 26-28, 30, 34, 39, 46-47, 49-52,

26   57, 60, 61, 64-65, 70-71, 73-75, 77-78, 80, 82, 89-90, 97, 105-111, 113 (08-2997 Dkt. 32); and
     NSD *Vaughn* Index Part 1, Groups 2, 5, 7, 8 & Part 2, Groups 5, 7 & 8. EFF continues to challenge

27   the Exemption 5 and 6 withholdings to the extent that records can be disclosed without revealing

28   classified information or the government's intelligence sources and methods.

agents or representatives of the carriers within those communications.

## III.   ARGUMENT

### A.   The Freedom Of Information Act and the Standard of Review

The Freedom of Information Act is intended to safeguard the American public's right to know "what their Government is up to." *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989). The central purpose of the statute is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). "[D]isclosure, not secrecy, is the dominant objective of the [FOIA]." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). The Supreme Court has stated that "[o]fficial information that sheds light on an agency's performance of its statutory duties falls squarely within [the] statutory purpose." *Reporters Comm.*, 489 U.S. at 773.

The statute requires an agency to disclose agency records at the request of the public unless the records fall within one of nine exemptions. 5 U.S.C. § 552(b). If requested information does not fit squarely into one of these categories, the law requires federal agencies to make it available to the general public. *NLRB,* 437 U.S. at 221 (1978); *Nat'l Wildlife Fed'n v. U.S. Forest Service*, 861 F.2d 1114, 1116 (9th Cir. 1988) (same). The exemptions "have been consistently given a narrow compass," and agency records that "do not fall within one of the exemptions are improperly withheld[.]" *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989) (internal quotation marks omitted).

"Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law." *Laroche v. SEC*, No. 05-4760 CW, 2006 U.S. Dist. LEXIS 75415, 2006 WL 2868972, at *1 (N.D. Cal. Oct. 6, 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)); *see also* Fed. R. Civ. P. 56(c); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987). A court reviews the government's withholding of agency records *de novo*, and the government bears the burden of proving that a particular document falls within one of the nine narrow exemptions to the FOIA's broad mandate of disclosure. 5

-9-

U.S.C. § 552(a)(4)(B); *Reporters Comm.*, 489 U.S. at 755 ("Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'") (quoting 5 U.S.C. § 552(a)(4)(B)). An agency may submit affidavits to satisfy its burden, but "the government may not rely upon conclusory and generalized allegations of exemptions." *Kamman v. IRS*, 56 F.3d 46, 48 (9th Cir. 1995) (quoting *Church of Scientology v. Dep't of Army*, 611 F.2d 738, 742 (9th Cir. 1980) (internal quotation marks omitted)).

**B.    EFF is Entitled to Summary Judgment Because the Government Has Improperly Withheld Agency Records**

As described in detail below, the defendants have failed to satisfy their burden of proving that they have released all non-exempt material in response to EFF's FOIA requests. As a result, the Court should deny the government's consolidated motion for summary judgment and grant EFF's cross motion for summary judgment, requiring ODNI and DOJ to release all material they have improperly withheld under the FOIA.

**1.    The Defendants Have Failed to Meet the Procedural Requirements Necessary to Sustain Their Burden Under the FOIA**

In *Vaughn v. Rosen*, the D.C. Circuit established the procedural requirements that "an agency seeking to withhold records must follow in order to carry its burden. 484 F.2d 820, 828 (D.C. Cir. 1973). *Vaughn* requires that "when an agency seeks to withhold information it must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977) (citations omitted).[6] In *Wiener v. FBI*, the Ninth Circuit held that an agency must "identify[] each document withheld, the statutory exemption claimed, and a particularized

---

[6]  The *Vaughn* requirements are typically satisfied through an agency's submission of an affidavit describing the basis for its withholdings and providing justifications for redactions, accompanied by an index listing responsive records and indicating the precise redactions made to the records. We refer to the government's affidavits and indices, 08-2997 Dkt. 30-42, collectively herein as a "*Vaughn* submission."

explanation of how disclosure of the particular document would damage the interest protected by the claimed exemption." 943 F.2d 972, 977 (9th Cir. 1991). According to *King v. Dep't of Justice*, "[s]pecificity is the defining requirement" of an agency's *Vaughn* submission, and affidavits cannot sustain summary judgment if they are "conclusory, merely reciting statutory standards, or if they are too vague or sweeping." 830 F.2d 210, 219 (D.C. Cir. 1987). As the court concluded in *King*, "[c]ategorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate." *Id.* at 224 (footnote omitted).

Here, as we discuss more fully below in the context of specific exemption claims, the government has submitted several classic examples of the type of conclusory affidavit that the courts have long rejected. The utter inadequacy of the defendants' *Vaughn* submission leaves EFF and the Court unable to assess the validity of the defendants' claims that the disputed material is exempt from disclosure under various Exemption 5 privileges and Exemption 6. Regardless, "when an agency seeks to withhold information, it must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and *correlating those claims with the particular part of a withheld document* to which they apply." *Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (emphasis added; citations and internal quotation marks omitted). Based upon that failure alone, the Court should deny the government's consolidated motion for summary judgment.

### 2. The Defendants Have Improperly Withheld Agency Records Under Exemption 5

The FOIA contains a narrow exemption for "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). The exemption protects a record from disclosure where "its source [is] a government agency," and where the withheld material falls "within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001); *see also Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975) ("it is reasonable to construe Exemption 5 to exempt those documents, and only those documents,

1  normally privileged in the civil discovery context"). The defendants have claimed three distinct

2  privileges under Exemption 5 to withhold documents in this case: the presidential communications

3  privilege, the deliberative process privilege, and the attorney work product doctrine. In each case,

4  the government has failed to show that it has withheld all material properly and is entitled to

5  summary judgment.

6  **(a)     The Defendants Have Failed to Show That All Records**

7  **Satisfy the Inter-Agency or Intra-Agency Threshold Required to Claim Any Exemption 5 Privilege**

8         By its very terms, Exemption 5 protection is limited to "inter-agency or intra-agency"

9  materials. The FOIA unambiguously defines an "agency" as "any executive department, military

10 department, Government corporation, Government controlled corporation, or other establishment

11 in the executive branch (including the Executive Office of the President), or any independent

12 regulatory agency." 5 U.S.C. § 552(f). Notably, as the plain language of the statute makes clear,

13 neither Congress nor private corporations fall within this definition. As the D.C. Circuit has noted,

14 "It may well be true that if Congress had thought about this question, the Exemption would have

15 been drafted more broadly to include Executive Branch communications to Congress[.] But

16 Congress did not, and the words simply will not stretch to cover this situation, because Congress

17 simply is not an agency [within the statutory definition]." *Dow Jones & Co. v. Dep't of Justice,* 908

18 F.2d 1006, 1009 (D.C. Cir. 1990).[7] Furthermore, the legislative history of the FOIA indicates that

19 the term "Executive Office of the President" within the definition of "agency" was not intended to

20 include the "the President's immediate personal staff or units in the Executive Office whose sole

21 function is to advise and assist the President." H.R. Rep. No. 93-1380, at 232 (1974) (Hofmann

22 Decl. Ex. 16); *see also Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156

23 (1980). As such, Exemption 5 privileges do not typically extend to communications that have been

24

25 [7] It is thus puzzling that counsel for the House and Senate have submitted letters expressing concern about the reach of the FOIA to inter-Branch communications, which, as explained above, do not typically fall within the definition of "inter-agency or inter-agency" records. Declaration of Daniel P. Meyer ("Meyer Decl.") Exs. A & B ((08-2997 Dkt. 39). If Congress is dissatisfied with the definition of "agency" in the FOIA, it unquestionably has the power to amend the law, which was most recently updated little more than a year ago. OPEN Government Act of 2007. Pub. L. No. 110-175, § 4, 121 Stat. 2524 (2007).

26

27

28

-12-

shared with government bodies or private corporations outside an Executive branch agency because these entities simply are not "agencies" within the meaning of the FOIA.

The courts have fashioned an exception to this general rule: communications between agency officials and non-agency officials can satisfy the "inter-agency or intra-agency" threshold where the agency has solicited the communication from the outside party to facilitate its *own* deliberative process, so that the outside party is effectively a consultant, employee or advisor to the agency. The Supreme Court has found that records fall within this caveat if they "ha[ve] been received by an agency, to assist it in the performance of its own functions, from a person acting in a governmentally conferred capacity other than on behalf of another agency—*e.g.*, in a capacity as employee or consultant to the agency, or as employee or officer of another governmental unit (not an agency) that is authorized or required to provide advice to the agency." *Klamath,* 532 U.S. at 9-10. *See also Ryan v. Dep't of Justice*, 617 F.2d 781, 790 (D.C. Cir. 1980) (upholding deliberative process claim for questionnaire answers where DOJ solicited responses from senators); *Dow Jones & Co.,* 908 F.2d at 1009 ("as long as the documents are created for the purpose of aiding the *agency's* deliberative process . . . they will be deemed intra-agency documents even when created by non-agency personnel") (emphasis in original)); *Nat'l Institute of Military Justice v. Dep't of Defense*, 512 F.3d 677, 681 (D.C. Cir. 2008) (permitting the withholding of legal advice from non-governmental lawyers that the Defense Department had explicitly solicited)). Thus, any communications between the defendant agencies and non-agency parties that do not facilitate the agencies' deliberative processes do not satisfy the "inter-agency or intra-agency" threshold, and cannot qualify for Exemption 5 protection.

This rule governs not only agency communications with non-government parties, but applies with equal force to communications between an agency and Congress. *Dow Jones & Co.*, 908 F.2d at 1009 (deliberative process privilege did not extend to a letter sent from the Justice Department to the House Ethics Committee revealing an agency investigation into a congressman's activities); *Rockwell Int'l Corp. v. Dep't of Justice*, 235 F.3d 598, 604 (D.C. Cir. 2001) (agency did not waive Exemption 5 privilege by disclosing documents to a congressional subcommittee where the materials had been used to prepare an internal agency report and the subcommittee expressly

-13-

1   agreed not to make the documents public). Thus, outside governmental communications satisfy the

2   "inter-agency or intra-agency" threshold only when they are made to assist the *agency's*

3   deliberative process, not Congress's deliberative process.[8]

4          While the defendants have shown that some of the records at issue in this case qualify as

5   "inter-agency or intra-agency memoranda,"[9] the government has failed to show that a great deal of

6   withheld material meets this standard. Specifically, the defendants have not demonstrated that

7   certain agency communications with Congress about the FISA amendments were made in the

8   course of the agencies' *own* deliberative processes.[10] To the contrary, ODNI and DOJ were

9   communicating with Congress to facilitate *Congress's* deliberative efforts to craft legislation to

10  reform FISA. *See, e.g.,* Declaration of J. Michael McConnell ¶ 20 ("McConnell Decl.") (08-2997

11  Dkt. 42) ("As the communications at issue in this case reflect, congressional staff often actively

12  sought out the assistance of staff in the Executive Branch in crafting legislative provisions");

13  Declaration of Kathleen Turner ¶ 8 ("Turner Decl.") (08-2997 Dkt. 30) ("ODNI staff viewed it as

14  our responsibility to provide congressional staff with as much information and assistance as

15  possible" to develop legislation); Colburn Decl. ¶¶ 19-20 (discussing OLC's role "in the

16  negotiations and deliberations with Members of Congress and congressional staff concerning the

17  _____

18  [8] The government contends that the records at issue are "agency records" for purposes of the FOIA.
    However, it is worth noting that the D.C. Circuit has determined that congressional documents in

19  an agency's possession may not become agency records subject to disclosure under the FOIA in
    certain circumstances. *See Goland v. CIA*, 607 F.2d 339 (D.C. Cir. 1979), *vacated in part on other*

20  *grounds*, 607 F.2d 367 (D.C. Cir. 1979) (per curiam); *Holy Spirit Ass'n for the Unification of*
    *World Christianity v. CIA*, 636 F.2d 838 (D.C. Cir. 1980), *vacated in part on other grounds*, 455

21  U.S. 997 (1982); *Paisley v. CIA*, 712 F.2d 686 (D.C. Cir. 1983), *vacated in part on other grounds*,

22  724 F.2d 201 (D.C. Cir. 1984) (per curiam); *United We Stand America, Inc. v. IRS*, 359 F.3d 595
    (D.C. Cir. 2004). This line of cases allows Congress to retain control over documents in an

23  agency's possession when Congress expressly manifests an intent to keep the materials confidential
    at the time of their creation—though not retrospectively in response to FOIA litigation. *United We*

24  *Stand*, 359 F.3d at 602-03. While DOJ and ODNI now complain that "those participating in the
    communications believed them to be confidential," Mot. Summ. J. at 12:27-28, there is no

25  evidence that Congress expressed an intent to maintain control over the records at issue in this case

26  at the time they were created.
    [9] *See, e.g.*, records in ODNI *Vaughn* Index Group 5; OIP *Vaughn* Index Groups 2-3, 9; OLC

27  *Vaughn* Index Groups 9, 37, 44, 49, 53-54, 57, 75-77, 79, 81-82, 85, 87, 112, 114-115; NSD
    *Vaughn* Index Part 1, Group 3.

28  [10] *See, e.g.*, records in ODNI *Vaughn* Index Groups 2, 3, 6; NSD *Vaughn* Index, Groups 1, 2, 4, 5.

-14-

FISA reform legislation"); Hackett Decl. ¶ 37 ("Senior officials were regularly making decisions regarding how best to work with Congress on this legislation"). While the defendants may wish to keep all "inter-Branch" communications confidential, the FOIA simply was not written to permit such broad withholding. *See Dow Jones & Co.*, 908 F.2d at 1010 n.2 (rejecting government's argument that Exemption 5 should be interpreted as a "government-wide, inter-branch exemption.") Many records at issue in this case clearly do not meet the "inter-agency or intra-agency" threshold for Exemption 5 protection, and thus have been improperly withheld by the defendants.

Similarly, communications between representatives of the telecommunications companies and government officials fail to meet the threshold requirement necessary to claim Exemption 5 protection. This case presents a situation similar to *Klamath*, in which the Supreme Court found that correspondence from Indian tribes to the Department of the Interior did not qualify for Exemption 5 status where the tribes had communicated with the agency "with their own . . . interests in mind," rather than to serve the agency's interests. 532 U.S. at 11. Here, the telecommunications companies were communicating with the government to ensure Congress passed legislation that would give them immunity from legal liability. They were communicating to advance their own interests, not the policy deliberations of ODNI or DOJ. As such, the companies' communications with the agencies also fail to meet the threshold for Exemption 5 protection.

The government claims that the doctrine of constitutional avoidance requires the Court to find that the withheld records meet the "inter-agency or intra-agency" threshold. Mot. Summ. J. at 13:7-14:1. This canon provides that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Counsel*, 485 U.S. 568, 575 (1988). It is well settled, however, that this principle is irrelevant unless a statute is ambiguous and subject to more than one interpretation. *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494 (2001) ("the canon of constitutional avoidance has no application in the absence of statutory ambiguity.").

-15-

This case is similar to *Citizens for Responsibility and Ethics in Government ("CREW I") v. Dep't of Homeland Security*, in which the defendant agency argued that the doctrine of constitutional avoidance required the court to construe the FOIA so that White House visitor records fell outside the scope of the statute. 527 F. Supp. 2d 76, 98 (D.D.C. 2007), *appeal dismissed on other grounds*, 532 F.3d 860 (D.C. Cir. 2008). The court rejected this argument, noting that the agency had failed to identify any ambiguity in the FOIA that created a constitutional problem. 527 F. Supp. 2d at 99. Here, the government is similarly unable to point to any language in the text of the FOIA that creates uncertainty or confusion about the scope of the law. In fact, the FOIA's language could not be more clear about what an "agency" is. If the government has concerns about the scope of the FOIA, it should consider seeking an amendment to the statute. The mandate of this Court, however, is to apply the law as written.

> **(b)   The Defendants Have Failed to Show that Records Have Been Properly Withheld Pursuant to the Presidential Communications Privilege**

The first Exemption 5 privilege defendants assert is the presidential communications privilege, which protects communications reflecting deliberations that the President determines should remain confidential. *United States v. Nixon*, 418 U.S. 683, 708 (1974). The privilege covers documents authored or solicited and received by the President, and also extends "down the chain of command" to the President's "immediate White House advisors" and their staffs. *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1115-16 (D.C. Cir. 2004). However, the D.C. Circuit has held unequivocally that the privilege does not apply outside the White House to officials in Executive agencies. *Id.* at 198; *In re Sealed Case (*hereafter "*Espy*"), 121 F.3d 729, 752 (D.C. Cir. 1997). Furthermore, the privilege is limited to White House advisors who have "broad and significant responsibility for investigating and formulating the advice to be given to the President on the particular matter to which the communications relate." *Espy,* 121 F.3d at 752.[11]

In considering the government's claims, the Court must "proceed on the basis that 'the

---

[11] The question of whether the President must personally invoke the presidential communications privilege in civil discovery remains undecided. *Judicial Watch*, 365 F.3d at 1114 (citing *Espy*, 121 F.3d at 744-45 n.16).

presidential communications privilege should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected.'" *Judicial Watch*, 365 F.3d at 1116 (quoting *Espy*, 121 F.3d at 752). Guided by the mandate to narrowly construe the privilege, in cases such as this where the disputed material involves the communications of *advisors*, rather than the President himself, the D.C. Circuit has "recognized that the need for the presidential communications privilege becomes more attenuated the further away the advisers are from the President." *Judicial Watch,* 365 F.3d at 1123; *see also id*. at 1115 ("there is, in effect, a hierarchy of presidential advisers such that the demands of the privilege become more attenuated the further away the advisers are from the President operationally.") (citing *Espy*, 121 F.3d at 752).

Here, the defendants have made sweeping invocations of the privilege that are wholly unsupported by the law. First, the vast majority of material withheld under this privilege has no apparent connection to any White House official. Indeed, the privilege has been claimed repeatedly to shield communications among Executive agency officials, congressional staffers, and representatives of the telecommunications companies where the communication has no nexus to the White House whatsoever.[12] As the government has already conceded, the case law flies in the face of applying the privilege in this manner. Mot. Summ. J. at 21:22-22:8 (noting that *Judicial Watch* refused to accept such a broad application of the privilege and complaining that it was "wrongly decided"). No court has extended the presidential communications privilege beyond White House officials. *See Espy*, 121 F.3d at 752 ("the privilege should not extend to staff outside the White House in executive branch agencies"), *Judicial Watch*, 365 F.3d at 1114 (declining to extend the presidential communications privilege to all agency documents related to the preparation of the Deputy Attorney General's pardon recommendations to the President).[13]

Second, even for the relatively few communications the government claims have some

---

[12] *See, e.g.*, ODNI *Vaughn* Index Groups 2-3, 6; OIP *Vaughn* Index Groups 2-7, 9; OLC *Vaughn* Index Groups 1, 7-8, 11, 13-20, 22-23, 25, 29, 31-33, 35-45, 47-49, 51, 53-59, 61-73, 75-79, 81-93, 97-111; NSD *Vaughn* Index Part 1, Groups 4-7 & Part 2, Groups 5-6.

[13] Of course, no court has applied the presidential communications privilege to private companies, as Mr. Meyer suggests. Meyer Decl. ¶ 23*; see also* Hackett Decl. 44.

connection to a White House official,[14] the defendants have failed to identify the advisors and the responsibilities that they exercise, and whether the communications were authored or solicited and received by these officials. Reciting the language of *Espy*, the government cursorily claims that

> *some* of the withheld documents . . . were authored by, or solicited and received by, the President's White House staff, including representatives from the White House Office of the Chief of Staff, the White House Counsel's Office, the White House Office of Legislative Affairs, and the White House Office of Communications, as well as the Office of the Vice President.

Meyer Decl. ¶ 22 (emphasis added). As an initial matter, the government's *Vaughn* submission in this case is even weaker than in *Center for Biological Diversity v. Office of Management and Budget*, where Judge Patel recently found that an agency failed to justify its invocation of the presidential communications privilege where it provided the names of White House officials for which the privilege was claimed, but did not explain their capacities, proximity to the President, or roles in authoring or soliciting and receiving the documents. No. 07-4997 MHP, 2008 U.S. Dist. LEXIS 98387, 2008 WL 5129417, at *12 (N.D. Cal. Dec. 4, 2008). Here, the government has provided none of this information.[15]

Even so, the substance of the *Vaughn* submission undermines the government's claim that each communication involving the White House was "authored or solicited and received" by the White House official involved. First, the presidential communications privilege covers only *communications*, as the name of the privilege plainly states. *Citizens for Responsibility and Ethics in Washington v. Dep't of Homeland Security* ("*CREW II*"), No. 06-1912, slip op. at 9 (D.D.C. Jan. 9, 2009) (Hofmann Decl. Ex. 17). It is therefore inappropriate to apply the privilege, as the defendants have done here, to documents that are *not* communications such as draft legislation,

---

[14] *See, e.g.*, ODNI *Vaughn* Index Groups 2 & 6; OIP *Vaughn* Index Groups 1 & 8; OLC *Vaughn* Index Groups 2-3, 6, 10, 12, 15-16, 21, 24, 26, 94-96 &113; NSD *Vaughn* Index Part 1, Groups 1, 4-7, Part 2, Groups 4-5.

[15] It is interesting that the government makes a point to note that Daniel P. Meyer, Assistant to the President for Legislative Affairs, personally participated in "regular conference calls involving staff at ODNI, DOJ, and the White House . . . in the course of which the participants discussed the emerging legislative approach to FISA reform, the legislative process, and negotiation strategy," Meyer Decl. ¶ 8, yet does not claim that Mr. Meyer actually has any connection to the materials withheld under the presidential communications privilege in this case.

1    handwritten notes, and calendar entries scheduling calls with members of Congress.[16] Where

2    communications are actually involved, the Office of Legal Counsel's *Vaughn* index shows that

3    White House employees were merely copied on some of the communications for which the

4    privilege is claimed, making it highly unlikely that those documents were "authored or solicited

5    and received" by the White House party. *See* OLC *Vaughn* Index Groups 6, 21. Moreover, the

6    defendants' bald characterization of emails as "between," "among" or "to" parties including White

7    House representatives does not provide enough detail to show that the communications satisfy the

8    exacting standard established by *Espy* and *Judicial Watch*. *See* ODNI *Vaughn* Index Group 6; OIP

9    *Vaughn* Index Groups 1 & 8; OLC *Vaughn* Index Groups 2-4, 10, 12, 15-16, 24, 26, 74, 94-96 &

10   113; NSD *Vaughn* Index Part 1, Group 2 & Part 2, Group 5.

11       Finally, *Espy* made clear that the presidential communications privilege "should never serve

12   as a means of shielding information regarding governmental operations that do not call ultimately

13   for direct decisionmaking by the President." 121 F.3d at 752. Here, the government has failed to

14   explain how the governmental operations to which some of the allegedly privileged

15   communications relate satisfy this standard. It is difficult to see, for example, how emails

16   concerning potential press inquiries or technical edits to legislative language could possibly involve

17   the direct decisionmaking of the President.[17] Moreover, all the documents at issue in this case

18   relate fundamentally to *Congress's* development of legislation to amend FISA. The President may

19   have input into the legislative process and sign or veto legislation that has passed the House and

20   Senate, but Congress retains the constitutional power to pass laws, including the power to override

21   a presidential veto.[18] U.S. CONST. art. I, § 7. With respect to certain documents withheld under the

22   presidential communications privilege, the defendants do not even come close to establishing the

23   required nexus to presidential decisionmaking, and thus have failed to carry their burden of

---

[16] *See, e.g.*, ODNI *Vaughn* Index Group 3; OLC *Vaughn* Index Groups 78, 88 & 98-104; NSD *Vaughn* Index Part 1, Groups 1, 6-7.

[17] *See, e.g.*, OLC *Vaughn* Index Group 3; NSD *Vaughn* Index Part 1, Group 5.

[18] Indeed, amendments to the FOIA survived presidential veto when Congress sought to strengthen the law in 1974, after the Watergate scandal. *See* National Security Archive, Veto Battle 30 Years Ago Set Freedom of Information Norms (Nov. 23, 2004), http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB142/index.htm.

showing that the requested records are exempt from disclosure under the presidential communications privilege.

Unable to point to a single opinion supporting their expansive reading of the presidential communications privilege, the defendants urge the Court to adopt a new "functional approach" to protect any information "generated in the course of advising or otherwise assisting the President in the exercise of a quintessential and nondelegable Presidential power." Mot. Summ. J. at 23:1-8 (internal quotation marks and ellipsis omitted). The courts have refused to take this approach time and time again. *See Judicial Watch*, 365 F.3d at 1118-19; *CREW II*, No. 06-1912, slip op. at 9-10. As *Judicial Watch* noted an extension of the presidential communications privilege to agency records "that never make their way to the Office of the President on the basis that the documents were created for the sole purpose of advising the President on a non-delegable duty is unprecedented and unwarranted." 365 F.3d at 1116-1117. If accepted, the government's argument could effectively render the FOIA a nullity, since the President could claim that virtually any agency record is somehow related to presidential decisionmaking even if nobody in the White House wrote or received it. *Cf. Ryan*, 617 F.2d at 788 ("defining 'agency records' by the purpose for which they exist[] would cut back severely on the FOIA's reach as interpreted by courts since its inception."). This concern is particularly acute in this case, where the presidential communications privilege has been claimed to shield documents involving "dual hat" advisors who perform duties in addition to advising the President. *Judicial Watch*, 365 F.3d at 1120; *Cf. Ryan*, 617 F.2d at 789 ("Many cabinet officers, like the Attorney General, or the Office of Legal Counsel under him, act as advisors to the President for many of their important functions; yet they are not members of the presidential staff or exclusively presidential advisors, and are thus not exempt from FOIA requirements.") As the D.C. Circuit noted in *Ryan*:

> In many different areas the President has a choice between using his staff to perform a function and using an agency to perform it. While not always substantively significant, these choices are often unavoidably significant for FOIA purposes, because the Act defines agencies as subject to disclosure and presidential staff as exempt. To redraw this statutory line in a different manner, based on complex functional considerations, would strain the language of the Act and present much greater complexity in litigation.

617 F.2d at 789 (rejecting argument that the Attorney General should be considered an immediate

-20-

presidential advisor in certain cases and therefore beyond the reach of the FOIA). The Court should not extend the presidential communications privilege in such an unprecedented way to shield material to which the public has a statutory right of access.

   **(c)**  **The Government Has Failed to Show that Records Have Been Properly Withheld Pursuant to the Deliberative Process Privilege**

  "Predecisional and deliberative" agency records are protected from disclosure under the deliberative process privilege, "while those that simply state or explain a decision the government has already made . . . are not." *Judicial Watch*, 365 F.3d at 1113 (*quoting Espy*, 121 F.3d at 737) (internal quotation marks omitted). If a record meets the "inter-agency or intra-agency" threshold, it may be withheld pursuant to the deliberative process privilege only if it is both (1) 'predecisional' or 'antecedent to the adoption of agency policy' and (2) 'deliberative,' meaning 'it must actually be related to the process by which policies are formulated.'" *Nat'l Wildlife Fed'n*, 861 F.2d at 1117 (quoting *Jordan v. Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978)) (emphasis in original); *see also Maricopa Audubon Soc'y v. U.S. Forest Service*, 108 F.3d 1089, 1092 (9th Cir. 1997); *Assembly of the State of Cal. v. Assembly Comm. on Elections*, 968 F.2d 916, 920 (9th Cir. 1992).

  As the Ninth Circuit has explained, "Exemption 5 cases contrast agency documents leading to a decision with documents explaining or interpreting a decision after the fact. Because an agency's interpretations of its decisions often become the 'working law' of the agency, documents deemed 'postdecisional' do not enjoy the protection of the deliberative process privilege." *Assembly*, 968 F.2d at 920 (citing *NLRB v. Sears*, 421 U.S. 132, 153 (1975) ). It is the agency's burden to "establish[] the character of the decision, the deliberative process involved, and the role played by the documents in the course of that process." *United States v. Rozet*, 183 F.R.D. 662, 666 (N.D. Cal. 1998) (citing *Strang v. Collyer*, 710 F. Supp. 9, 11 (D.D.C. 1989), *aff'd*, 899 F.2d 1268 (D.C. Cir. 1990) (internal quotation marks omitted). An agency must also "*identify a specific decision* to which the document is predecisional" in order to withhold information under Exemption 5. *Maricopa Audubon Soc'y,* 108 F.3d at 1094 (emphasis added); *see also Assembly*, 968 F.2d at 921; *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980).

As an initial matter, many descriptions of withheld records in the defendants' *Vaughn* submission are too vague to demonstrate that the deliberative process privilege has been properly invoked at all. Neither the Court nor EFF can identify a deliberative process or agency decision to which the process is predecisional when a document is described in such perfunctory terms as "handwritten notes regarding FISA," or "email chain between DOJ and ODNI officials discussing a telephone call received from a telecommunications company." ODNI *Vaughn* Index Group 6; NSD *Vaughn* Index Part 1, Group 6. Such unspecific descriptions are inadequate to sustain a withholding under the deliberative process privilege.

Furthermore, the defendants have improperly withheld post-deliberative material. The "deliberation" that is important for purposes of the privilege is the agency's internal deliberation, not an outside party's deliberation. The records in this case are related to Congress's efforts to amend FISA, an ongoing process that lasted for many months. However, the defendants' internal deliberations consisted of developing their positions on the evolving legislation—positions that were periodically finalized and conveyed to outside parties. In such situations, "even if a document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Rozet*, 183 F.R.D. at 666 (citing *Coastal States*, 617 F.2d at 866). Here, the Administration adopted many positions during the course of the FISA reform debate that were used in its dealings with Congress and the public. *See, e.g.*, Executive Office of the President, Office of Management and Budget, *Statement of Administrative Policy on S. 2248—To Amend the Foreign Intelligence Surveillance Act of 1978* (Dec. 17, 2007); Executive Office of the President, Office of Management and Budget, *Statement of Administrative Policy on H.R. 5104—To Extend the Protect America Act of 2007 for 30 Days* (Jan. 28, 2008); Executive Office of the President, Office of Management and Budget, *Statement of Administrative Policy on H.R. 5349—To Extend the Protect America Act of 2007 for 21 Days* (Feb. 13, 2008) (collectively Hofmann Ex. 18); *see also generally* Dep't of Justice, Recent Congressional Testimony/Letters, http://www.lifeandliberty.gov. Even where agency records relate to internal deliberations about FISA reform, the defendants cannot justify labeling records about all aspects of that process predecisional.

The defendants have also improperly withheld non-deliberative material. The privilege may not be invoked to "protect material that is purely factual" rather than deliberative. *Judicial Watch*, 365 F.3d at 1113 (*quoting Espy*, 121 F.3d at 737); *see also Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) ("[u]nder the deliberative process privilege, factual information generally must be disclosed"). Some of the documents withheld by the defendants appear to contain just this type of factual material. For example, emails forwarding and discussing copies of Justice Department "fact sheets" on the need to amend FISA appear to include not only factual information, but also the agency's final position in its dealings with Congress on the matters discussed. OLC *Vaughn* Index Groups 41-42. Similarly, "talking points" concerning the impact of modernizing FISA appear to be potentially both factual and represent the Justice Department's final policy on the matters they address.[19] OIP *Vaughn* Index Group 4; NSD *Vaughn* Index Part 1, Group 5-6. Furthermore, documents that simply report or provide summaries of conversations with congressional staffers, briefings after the fact, or Hill activity are factual and not deliberative. *See*, *e.g.*, OLC *Vaughn* Index Groups 26, 37, 85; OIP *Vaughn* Index Groups 1, 3, 5, 7-9. Calendar entries similarly reflect the fact that calls occurred between Office of Legal Counsel officials and members of Congress, but reveal no agency deliberative processes. *See* OLC *Vaughn* Index Groups

---

[19] As the District of Columbia district court recently held, "the likelihood" that withheld materials "have been relied upon or adopted as official positions after their preparation . . . is particularly high in the case of 'talking points[.]'" *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 511 F. Supp. 2d 56, 71 (D.D.C. 2007). *See also N.Y. Times Co. v. Dep't of Defense*, 499 F. Supp. 2d 501, 514-515 (S.D.N.Y. 2007 ("talking points and the formulation of responses to possible questions" prepared "to aid in briefing officials and preparing them to answer questions," and "for the Attorney General so that he can be prepared to answer inquiries from the press" held not properly withheld under Exemption 5); *Judicial Watch, Inc. v. Dep't of Energy*, 310 F. Supp. 2d 271, 327 (D.D.C. 2004), *affirmed in part and reversed in part on other grounds*, 412 F.3d 125 (D.C. Cir. 2005) ("documents [that] consist of talking points . . . appear to be improperly withheld"); *Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 265-266 (D.D.C. 2004) , []("draft talking points" not properly withheld where agency "identifies nothing more specific about the content of this document, does not specify its place in a particular decisionmaking context, and does not indicate whether, as a draft, these talking points were actually used in a communication with the public"). Here, the defendants' affidavits make clear that the talking points were used by the defendants to communicate final agency policies to Congress, the public and the media. *See* Steele Decl. ¶ 30 (talking points "used to brief officials and prepare them to answer inquiries . . . in anticipation of questions from members of the public, as well as Congressional inquiries"); Pustay Decl. ¶ 61 (talking points "used to brief officials and prepare them to answer inquiries from Congress, members of the public, or the media").

98-104. Thus, the defendants have failed to show that they have withheld only predecisional, deliberative materials.

> **(d)** **The Government Has Failed to Show that Records Have Been Properly Withheld Pursuant to the "Common Interest" Privilege or the Attorney Work Product Doctrine**

The attorney work product and common interest privileges are designed to protect documents prepared by an attorney that reveal the attorney's theory of the case or litigation strategy. *Fed. Trade Comm'n v. Grolier, Inc.*, 462 U.S. 19 (1983). It is not, however, designed to protect lobbying efforts with respect to prospective *legislation. U.S. Postal Serv. v. Phelps Dodge Refining Corp.*, 852 F. Supp. 156, 164 (E.D.N.Y. 1994) ("Lobbying conducted by attorneys does not necessarily constitute legal services for purposes of the attorney-client privilege."); *In re Grand Jury Subpoenas dated March 9, 2001*, 179 F. Supp. 2d at 285 n.6 (citing *United States Postal Serv.,* 852 F. Supp. 156, *Harper-Wyman Co. v. Connecticut General Life Ins. Co.*, No. 86 C 9595, 1991 U.S. Dist. LEXIS 5007, 1991 WL 62510 (N.D. Ill. Apr. 17, 1991) and *North Carolina Elec. Membership Corp. v. Carolina Power & Light Co.,* 110 F.R.D. 511 (M.D.N.C. 1986).

In *Harper-Wyman* the court found that documents prepared in connection with insurance industry's lobbying efforts were not protected by the work product doctrine. "While the insurance industry's lobbying efforts may have been sparked by lawsuits against insurers, a motivation to avoid potential claims does not supply the necessary foundation for a finding that the work product privilege applies." *Harper-Wyman,* 1991 WL 62510, at *3. In *North Carolina Elec. Membership Corp.*, the Court held that even though the companies' lobbying efforts were coordinated by the legal department, the resulting "communications from counsel to management are not legal advice," nor were "updates on lobbying activities requests for legal advice." *North Carolina Elec. Membership Corp.,* 110 F.R.D. at 516-17.

Nevertheless, the government gamely argues that the attorney work product doctrine applies to agency records reflecting communications with the telecommunications companies and their lobbyists due to the common interest privilege, citing *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003) ("The common interest privilege . . . applies where (1) the

-24-

communication is made by separate parties in the course of a matter of common interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived.") The defendants acknowledge, as they must, that the "common interest must be a legal one, and the communication must be designed to further that particular legal interest." Mot. Summ. J. at 24:16-18 (citing *Berger v. Seyfarth Shaw LLP*, 07-05279 JSW, 2008 U.S. Dist. LEXIS 88811, 2008 WL 4681834, at *2 (N.D. Cal. Oct. 22, 2008) and *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007)).[20]

The government's chief case, *Bergonzi,* relies upon *United States v. MIT*, 129 F.3d 681 (1st Cir. 1997), to address the scope of the common interest doctrine. *MIT*, however, shows that the common interest privilege does not apply to the government's communications with the telecommunications companies regarding the FISA legislation. In *MIT*, the First Circuit found that the university and the government had

> a "common interest" in the proper performance of MIT's defense contracts and the proper auditing and payment of MIT's bills. But this is not the kind of common interest to which the cases refer in recognizing that allied lawyers and clients—who are working together in prosecuting or defending a lawsuit or in certain other legal transactions—can exchange information among themselves without loss of the privilege.

*MIT*, 129 F.3d at 686.

Here, as in *MIT,* the claimed interest is not a legal one. Instead, the defendants rely primarily upon the government's concerns about "the risk of unauthorized disclosure of certain intelligence activities, information, sources, and methods, as well as the risk that private companies might be less willing to assist intelligence activities due to concern about the prospect of facing burdensome legal claims." Mot. Summ. J. at 24:25-27.[21] To the contrary, when the United States

---

[20] As the government also acknowledges, it is a party-intervenor, not a defendant, in the consumer class actions against the telecommunications companies. Mot. Summ. J. at 24:28-25:1. With respect to the investigations conducted by various state attorneys general, the United States is a *plaintiff*, while the telecommunications companies are *defendants*. Mot. Summ. J. at 25:5-7. Nevertheless, the United States refers to the telecommunications companies as co-defendants throughout its brief.

[21] The government's interest is preventing disclosure through further litigation is limited to "unauthorized disclosure." Plaintiffs respectfully submit that the Court in *In re NSA*, No. 06-1791 VRW, will only provide for authorized disclosure.

first moved to intervene, it asserted that "United States' interest is not adequately represented by the parties," and specifically noted that "the [telecom] parties' interest may well be in the *disclosure* of state secrets to the extent that doing so might assist them in presenting their claims or defenses fully to vindicate their own private interests." *Mot. to Intervene by the United States of America* (*Hepting v. AT&T*, Case No. 06-0672-VRW) at 6:16-17 and 7:11-13 (emphasis original) (Hofmann Decl. Ex. 19). Even if the telecommunications companies share the government's interests,[22] they are political and business interests, not legal interests. Indeed, like MIT's relationship with the audit agency in *MIT*, the relationship between the government and the recipient of government orders purporting to require assistance in surveillance "is easily characterized as adversarial." *See MIT*, 129 F.3d at 686; *see, e.g., John Doe, Inc. v. Mukasey*, __ F.3d __, No. 07-4943, 2008 U.S. App. LEXIS 25193, 2008 WL 5205951 (2nd Cir. Dec. 15, 2008) (communications provider lawsuit against government seeking to invalidate a government surveillance request under the National Security Letter authority). Likewise, any communications related to Section 803 of the FISAAA, 50 U.S.C. § 1885b, which preempts the state attorneys general investigations, is not protected because the government and the carriers are adversarial parties in those lawsuits.[23]

The government also contends that it and the carriers share a common interest in reducing the possibility that the carriers will refuse to cooperate with lawful surveillance. To the contrary, this is a trade of interests: the carriers seek to further their interest in avoiding liability for their violations of law and the government seeks to further its interest in continued surveillance. Assuming *arguendo* that these are legal interests, this is not protected by the common interest

---

[22] The defendants have presented no evidence showing whether or not the telecommunications companies share these interests. To the extent that any inference could be made from the declarations submitted by the defendants, such inferences are inadmissible hearsay.

[23] The cases in which the United States sued the carriers are *United States v. Rabner, et al.* (07-1324); *United States v. Gaw, et al.* (07-1242); *United States v. Adams, et al.* (07-1323); *United States v. Palermino, et al.* (07-1326); and *United States v. Volz, et al.* (07-1396). For example, in *United States v. Rabner* the United States filed a complaint against, *inter alia*, Sprint Nextel Corporation, Cingular Wireless LLC, AT&T Corp., Verizon Communications Inc., and Qwest Communications International, Inc. In the remaining state investigation case in *In re NSA* MDL, *Clayton, et al. v. AT&T Communications of the Southwest, Inc., et al.* (07-1187), the United States is not a party as an intervenor or otherwise.

privilege. The defendants have cited no authority, because there is none, for the notion that the common interest privilege encompasses a *quid pro quo* of separate interests. If the carriers are unwilling to cooperate with the government, the carriers and the government have an adversarial relationship, not a common interest. Accordingly, any agency records that reflect the possibility that the carriers will refuse to cooperate with the government are not covered by the common interest exception. To hold that the common interest privilege encompasses the interest in not having future disagreements on separate issues would eviscerate the rule.

Instead the interest is, at best, like the business interests rejected by *Nidec.* 249 F.R.D. at 579-80 (citing *Bank Brussels Lambert v. Credit Lyonnais*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995) (stating that "the common interest doctrine does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation") and *Oak Industries v. Zenith Industries*, No. 86 C 4302, 1988 U.S. Dist. LEXIS 7985, 1988 WL 79614, at *4 (N.D. Ill. July 27, 1988) ("declin[ing] to expand the coverage of the attorney-client privilege to information which a party freely shares with other business persons")).

The government also asserts more generally a "common interest in the impact of the FISA amendments on the pending litigation, and the communications between the participants about the FISA amendments furthered that specific legal interest." Mot. Summ J. at 26:3-5. As noted above, this interest would not encompass agency records reflecting the telecommunications carriers' threat to refuse future cooperation unless they received legislative immunity. Likewise, to the extent that the government and the carriers have a legitimate common legal interest in legislation that would actually make the warrantless wiretapping legal, this is not at issue in this case. As the government acknowledged in the multi-district litigation, the FISA legislation does not address the legality of the warrantless surveillance program. *See United States' Reply in Support of Mot. to Dismiss and for Summary Judgment* (MDL 06-1791 Dkt. 520) at 6 and n.5 (Hofmann Decl. Ex. 20). In addition, the legislation does not impact the government's own legal interests. *Id.* at 4 (acknowledging that the FISA legislation "does not apply to claims against Government defendants, Plaintiffs remain free to seek such relief against Government actors."); *see also* 50 U.S.C. §1885(5) (defining a "covered civil action" as including only a suit that "seeks monetary or other relief from the

-27 -

electronic communication service provider[.]") Furthermore, the government has contended elsewhere that the DOJ's interest in immunity is a policy interest, not a legal interest. Hofmann Decl. Ex. 20 at 15. Accordingly, agency records that reflect communications with the carriers that further the policy interest of the government in ending the litigation *against the carriers* are not protected by the common interest privilege, because this is not a legal interest *of the government*.

       *Hunton & Williams, LLP v. Dep't of Justice* does not compel a different result. In *Hunton*, the government asserted that:

> the government and [the developer of the Blackberry communication device] shared a common interest in preventing or forestalling the entry of an injunction to the extent that it would impair the public interest and, in the alternative, finding a feasible method where the government and its contractors could continue the use of BlackBerry systems if an injunction was entered.

No. 06-477, 2008 U.S. Dist. LEXIS 26015, 2008 WL 906783, at *6 (E.D. Va. March 31, 2008). The Eastern District of Virginia agreed, finding a common legal interest in "preventing or limiting the scope of an injunction in the BlackBerry Litigation." *Id.* However, this did not mean that all documents between the parties were off-limits. Instead, the court imposed a time limit (requiring disclosure of documents before the injunctive issue came to the fore), and reviewed the withheld documents *in camera* to see if they related to the identified common legal interest.

       In the *In re NSA* MDL, no request for an injunction is currently pending, and the FISA legislation at issue does not address any injunction. Assuming *arguendo* that the government and the carriers have a cognizable common legal interest in preventing an injunction against unlawful surveillance, few, if any, of the withheld documents are likely to address this common interest. EFF's FOIA requests seek agency records reflecting "discussion of immunizing telecommunications companies or holding them otherwise unaccountable for their role in government surveillance activities," which concerns liability for past acts, not future injunctions.

       Furthermore, EFF notes that, to the extent that the government is asserting a common interest in continuing unlawful surveillance or hiding past illegal activity, such an interest is not protected by the common interest privilege or work product doctrine due to the crime-fraud exception. *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007) (citing *Clark v. United States*, 289 U.S. 1, 15 (1933) ("The privilege takes flight if the relation is abused. A client

-28-

1  who consults an attorney for advice that will serve him in the commission of a fraud will have no

2  help from the law. He must let the truth be told.")); *see also United States v. Edison*, Nos. CR 07-

3  0074 WHA & CR 07-0479 WHA, 2008 U.S. Dist. LEXIS 6825, 2008 WL 170660 (N.D. Cal. Jan.

4  17, 2008) (crime-fraud exception applies to work product doctrine).

5           As explained in detail in the *In re NSA* MDL docket, there is plentiful evidence that the

6  surveillance conducted by the carriers violates the law. *See, e.g.,* Hofmann Decl. Ex. 1 at 10 (MDL

7  06-1791 Dkt. 481, Summary of Evidence) ("The Program admittedly operated "in lieu of" court

8  orders or other judicial authorization") and at 42 ("Deputy Assistant Attorney General Patrick

9  Philbin . . . was concerned because '[o]n its face, the program violated two felony statutes

10 forbidding electronic surveillance without a warrant [and the] specified exceptions in those statutes

11 did not apply.'")  At a minimum, this evidence provides a "'factual basis adequate to support a

12 good faith belief by a reasonable person. . . *that in camera* review of the materials may reveal

13 evidence to establish the claim that the crime-fraud exception applies.'" *Napster,* 479 F.3d at 1092

14 (citing *United States v. Zolin*, 491 U.S. 554, 572 (1989)).

15          Nevertheless, to the extent that the agency records at issue truly reflect legal strategy for the

16 litigation (as opposed to lobbying efforts by the telecom carriers to avoid liability for violations of

17 the law or proposed *quid pro quo* of future cooperation for immunity), EFF does not seek such

18 records. For example, EFF does not seek drafts of briefs to be filed in the *In re NSA* MDL, or

19 communications that discuss strategy for such filings or hearings scheduled in that litigation. This,

20 however, leaves plenty of material appropriate for production. "Summaries of legislative meetings,

21 progress reports, and general updates on lobbying activities do not constitute legal advice and,

22 therefore, are not protected by the work-product immunity." *P. & B. Marina v. Logrande*, 136

23 F.R.D. 50, 59 (E.D.N.Y. 1991), *aff'd mem.*, 983 F.2d 1047 (2d Cir. 1992). In *P. & B. Marina,* the

24 Eastern District of New York found no work product protection for a lobbyist's correspondence

25 that was directed not towards "anticipated litigation but rather toward non-litigation means that

26 could achieve the same results in lieu of litigation." *Id.* at 59. Here, the FISA legislation at issue is

27 a non-litigation means of achieving a swift dismissal of the case in lieu of litigation on the merits.

28          Finally, the government has failed to meet its factual burden of showing that the withheld

-29-

agency records were prepared in contemplation of pending or potential litigation *against the government.*[24] As noted above, the legislation is designed only to protect the carriers against lawsuits. While there are pending cases against the government for its warrantless surveillance of ordinary American citizens, these cases are orthogonal to the FISA legislation at issue here. None of the government's declarations explains how the withheld documents relate to the government's potential or pending litigation (as opposed to, for example, the carriers' legal interests). *See, e.g.,* Kovakas Decl. ¶¶ 10, 11, 14, 17, 19 & 20.[25]

### 3.    The Defendants Improperly Withheld Records Under Exemption 6

Finally, this Court should order the agencies to produce agency records reflecting the identities of the carrier employees and their agents withheld pursuant to Exemption 6.[26] As an initial matter, the government has abandoned its Exemption 6 claims. While three declarations mention documents withheld pursuant to Exemption 6,[27] the government does not assert Exemption 6 in its consolidated motion for summary judgment. Because the government has not

---

[24] ODNI's affidavits, for example, make no attempt whatsoever to explain what interest the agency's communications with the carriers served, legal or otherwise. Hackett Decl. ¶¶ 44-45.

[25] Should the Court conclude that the defendants' invocations of privilege under Exemption 5 are valid, these claims must be still rejected because the defendants have waived them. It is a basic tenet of privilege law that "any voluntary disclosure . . . to a third party breaches the [claimed] confidentiality . . . and therefore waives the privilege." *In re Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982). Thus, to the extent the agencies have shared records with congressional staff, the White House, or other outside parties, any privilege they might have has been waived. *Espy,* 121 F.3d at 741-742 (holding the White House "waived its claims of privilege in regard to the specific documents that it voluntarily revealed to third parties outside the White House," and that the waiver applied "to executive privileges generally, [and] to the deliberative process privilege in particular.") It is beyond dispute that many of the records at issue here were "voluntarily revealed to third parties outside" the agencies claiming the privilege. It is equally clear that many of the withheld records were shared without any formal "agreements, conditions and understandings" between the agencies and congressional staffers, White House officials, or telecommunications companies. See Pustay Decl. ¶ 51 (records prepared and shared "with the *expectation* that they would be held in confidence") (emphasis added); Colburn Decl. ¶ 25 (same); Meyer Decl. ¶ 8 (discussing inter-Branch sharing of information on an "informal" and "confidential" basis); Declaration of Kenneth Wainstein ¶ 10 (same); Meyer Decl. Exs. A & B (same). Under these circumstances, it is beyond dispute that the agencies have "waive[d] [the asserted] privileges for the . . . information specifically released" to non-agency parties. *Espy,* 121 F.3d at 741.

[26] EFF is not seeking the contact information of government employees withheld pursuant to Exemption 6.

[27] *See* Putsay Decl. ¶ 67; Hackett Decl. ¶ 41; Steele Decl. ¶ 13. EFF does not seek the names and addresses of the National Security Division employees referenced in the Steele Declaration.

1  sought summary judgment on these claims it has abandoned the exemption, and this Court should

2  order the government to produce the agency records still in dispute that have been withheld

3  pursuant to Exemption 6.

4        Furthermore, even if the government had not waived Exemption 6, revealing the identities

5  of the carriers and their lobbyists is not a "clearly unwarranted invasion of personal privacy." 5

6  U.S.C. § 552(b)(6). First, "corporations, businesses and partnerships have no privacy interest

7  whatsoever under Exemption 6." *Wash. Post Co. v. Dep't of Agric.*, 943 F. Supp. 31, 37 n.6

8  (D.D.C. 1996); *Sims v. CIA*, 642 F.2d at 575 ("Exemption 6 was developed to protect intimate

9  details of personal and family life, not business judgments and relationships."); *Cohen v. EPA*, 575

10  F. Supp. 425, 429 (D.D.C. 1983) ("The privacy exemption does not apply to information regarding

11  professional or business activities") (decided on the basis of Exemption 7(c), a more privacy-

12  protective exemption). EFF's FOIA requests sought agency records of communications with

13  "representatives or agents of telecommunications companies," and therefore the responsive records

14  would reflect the business, not personal, capacities of the individuals.

15        Second, revealing the identify of lobbyists is not "clearly unwarranted." In his declaration,

16  John Hackett, Director of the Information Management Office for ODNI, incorrectly asserts that

17  the carriers' agents and employees "who communicate with the ODNI to discuss matters that are

18  viewed as controversial by some members of the public have an expectation that their names and

19  other identifying information will not be publicly disclosed." Hackett Decl. ¶ 41.[28] To the contrary,

20  applicable law requires disclosure. *See* the Lobbying and Disclosure Act of 1995 ("LDA") (2

21  U.S.C. § 1601) and the Honest Leadership and Open Government Act of 2007 (Pub. L. 110-81,

22  121 Stat. 735) (amending the LDA). For example, in 2008, AT&T and its lobbyists filed more than

23  eighty reports in the publicly available Lobbying Disclosure Act Database listing individuals who

24  conducted lobbying activities on its behalf with regard to FISA. Hofmann Decl. Ex. 21 (listing

25  AT&T's 2008 reports for FISA lobbying). The LDA requires disclosure of lobbying contacts with

26

27  [28] EFF also objects to this assertion as an evidentiary matter. Mr. Hackett cannot testify as to the
state of mind of the carrier employees. *See* Fed. R. Civ. P. 56(e) (moving party's claims must be

28  "made on personal knowledge").

the defendants.[29] *See* 2 U.S.C. § 1602(3) (defining "covered executive branch official"); *see also, e.g.,* Hofmann Decl. Ex. 22 (Lobbying and Disclosure Act reporting form listing individuals who lobbied, *inter alia*, DOJ and ODNI on the FISA legislation on behalf of AT&T). Statutory policies on disclosure strongly support disclosure. *See Wash. Post Co. v. Dep't of Health & Human Servs.*, 690 F.2d 252, 263, 265 (D.C. Cir. 1982) (Ethics in Government Act argues for disclosure); *Common Cause v. Nat'l Archives & Records Serv.*, 628 F.2d 179, 184-85 (D.C. Cir. 1980) (Federal Corrupt Practices Act policy favors disclosure).

Moreover, the identities of people who communicate with the government on controversial activities are routinely disclosed. *See Alliance for the Wild Rockies v. Dep't of the Interior*, 53 F. Supp. 2d 32 (D.D.C. 1999) (names and addresses of member of the public who submitted written comments on an agency's proposed rulemaking); *Bd. of Trade v. Commodity Futures Trading Comm'n*, 627 F.2d 392 (D.C. Cir. 1980) (identities of "trade sources" who had complained to the Commission about the business practices of the Chicago Board of Trade).

Finally, to the extent that representatives or agents of telecommunications companies have any privacy interest at all, it is outweighed by the strong public interest in determining how much the government was swayed by the carriers' lobbying efforts. *See, e.g.,* Hofmann Decl. Ex. 9. The carriers' privacy interest, if any exists, must be balanced against "the preservation of the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.'" *Rose*, 425 U.S. at 372. "[T]he purpose of FOIA is to permit the public to decide for itself whether the government action is proper[.]" *Int'l Bd. of Elec. Workers v. Dep't of Hous. & Urban Dev.*, 763 F.2d 435, 436 (D.C. Cir. 1985).

During the time period at issue, the government asserted that the carriers threatened to refuse future cooperation with lawful surveillance requests unless they were given immunity for

---

[29] The carriers are not required to disclose lobbying where it is "not possible to report without disclosing information, the unauthorized disclosure of which is prohibited by law." 2 U.S.C. § 1602(8)(B)(xi). While this may cover lobbying reports that would necessarily disclose classified information, it does not mean, as defendants assert, that all communications on "matters that are viewed as controversial by some members of the public" are protect by Exemption 6. To the contrary, the fact that the telecoms filed LDA forms means that at least some lobbying contacts *were* possible to report without disclosing information subject to Exemptions 1 and 3.

their past illegal behavior. *See* 08-2997 First Am. Compl. ¶¶ 21-30; *see also* McConnell Decl. ¶ 14 (asserting that "in the absence of retroactive liability immunity, 'the private sector might be unwilling to cooperate with lawful Government requests in the future'"). The identities of the carriers, and their agents, who pressured the government for this *quid pro quo* is important to informing the public about the government's action.

### 4. The Government Has Failed to Segregate Exempt Materials From Non-Exempt Material as the FOIA Requires

The FOIA explicitly requires that "[a]ny reasonably segregable potion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt[.]" 5 U.S.C. § 552(b); *see also Church of Scientology*, 611 F.2d at 744 ("it is error for a district court to simply approve the withholding of an entire document without entering a finding on segregability, or the lack thereof.")  The duty to segregate extends to material withheld under any of the FOIA's nine exemptions. *Church of Scientology*, 611 F.2d at 744 (the doctrine of segregability applies to all FOIA exemptions).

"In the Ninth Circuit, the district court must review the agency's segregability decisions on a document-by-document basis."  *NDRC v. Dep't of Defense*, 388 F. Supp. 2d 1086, 1096 (C.D. Cal. 2005) (citing *Wiener,* 943 F.2d at 988). To satisfy its burden, the agency must "describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Mead Data Cent*., 566 F.2d at 261; *see also NDRC*, 388 F. Supp. 2d at 1105 (finding an agency declaration inadequate on segregability grounds when it stated merely that "none of the withheld documents contain reasonably segregable information that is not exempt.")

Here, the defendants have failed to meet their burden of segregating all non-exempt material from exempt information, and in fact did not even address the issue of segregability in its consolidated motion for summary judgment.[30] To carry its burden, however, an agency is "required to provide the court with its *reasons*—as opposed to its simple conclusion—for their inability to segregate non-exempt portions of the documents, and also to provide the court with a description of

---

[30] Notably, OIP, NSD and the Civil Division are the only agency components that even attempted cursory segregability analyses in their *Vaughn* declarations. Pustay Decl. ¶ 68; Kovakas Decl. ¶ 25; Steele Decl. ¶ 36.

-33 -

OPP. TO DEFS.' CONSOL. MOT. SUMM. J.; NOT. OF CROSS MOT. AND
CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

'what proportion of the information in a document is non-exempt, and how that material is dispersed throughout the document.'" *Lawyers' Comm. For Civil Rights of San Francisco Bay Area v. Dep't of the Treasury*, No. 07-2590 PJH, 2008 U.S. Dist. LEXIS 87624, 2008 WL 448285, at *13 (N.D. Cal. Sept. 30, 2008) (quoting *Mead Data Cent.,* 566 F.2d at 261 (emphasis in original). The agencies have failed to satisfy their burden. Thus, the Court should order the defendants to conduct a line-by-line review of all withheld records to determine whether any non-exempt information can be disclosed.

## IV.    CONCLUSION

For the foregoing reasons, the government's consolidated motion for summary judgment should be denied, and EFF's cross motion for summary judgment should be granted.

DATED:  January 13, 2009                     Respectfully submitted,


                                              */s/ Marcia Hofmann*
                                             Marcia Hofmann, Esq.
                                             Kurt Opsahl, Esq.
                                             ELECTRONIC FRONTIER FOUNDATION
                                             454 Shotwell Street
                                             San Francisco, CA  94110
                                             Telephone:  (415) 436-9333
                                             Facsimile:  (415) 436-9993

                                             David L. Sobel *(pro hac vice)*
                                             ELECTRONIC FRONTIER FOUNDATION
                                             1875 Connecticut Ave. NW
                                             Suite 650
                                             Washington, DC  20009
                                             Telephone: (202) 797-9009 x104
                                             Facsimile: (202) 707-9066

                                             Attorneys for Plaintiff
                                             ELECTRONIC FRONTIER FOUNDATION